Asociación Pro Control de Acceso Calle Maracaibo, Inc., peticionaria y recurrente, *v.* Nancy Cardona Rodríguez y otros, opositores y recurridos; Vecinos Unidos, Inc., peticionarios y recurrentes, *v.* María Luisa Vilá y otros, opositores y recurridos; Municipio de San Juan, interventor.

*Número:* CE-95-91 *Resuelto:* 31 de octubre de 1997

1

4

6

8

10

*Héctor M. Collazo Maldonado,* abogado de la parte recurrente; *María S. Kortright Soler,* abogada de la parte recurrida; *Edgardo Rodríguez Quilichini* y *Miguel A. Santana Bagur, Procuradores Generales Auxiliares,* abogados del Estado; *Ayxa Rey Díaz* y *Teresa García Dávila,* abogadas del Municipio de San Juan.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Hoy nos corresponde pronunciarnos por primera vez sobre la constitucionalidad de la Ley Núm. 21 de 20 de mayo de 1987, según enmendada, 23 L.P.R.A. sec. 64 *et seq.,* que permite que residentes de una urbanización o comunidad controlen el acceso vehicular y peatonal a sus calles e inmediaciones. Específicamente, nos corresponde delimitar el alcance de la intervención que puede llevar a cabo un guardia de seguridad con el propósito de controlar el acceso a dos (2) de tantas comunidades en Puerto Rico que han establecido este sistema para garantizar la tranquilidad y seguridad de sus residentes.

En la primera controversia que presenta el recurso, Vecinos Unidos, Inc. cuestiona la parte de la sentencia del antiguo Tribunal Superior, Sala de San Juan, mediante la cual dicho foro revocó el permiso concedido por el Municipio de San Juan a la urbanización College Park bajo el fundamento de que una porción del sistema de control de acceso allí autorizado tiene el efecto de obstaculizar el flujo vehicular y peatonal por las vías que tienen continuidad entre la comunidad que solicitó el control y otras adyacentes. Por entender que el foro recurrido no erró al así decidir, confirmamos esta parte de la sentencia recurrida.

Por su parte, en la segunda controversia planteada, la Asociación Pro Control de Acceso Calle Maracaibo, Inc., Vecinos Unidos, Inc. y el Municipio de San Juan (en adelante el Municipio) solicitan que revisemos la determinación de que la Ley Núm. 21, según enmendada, *supra* (en adelante Ley sobre Control de Acceso), es constitucional siempre que

en su aplicación no se restrinja indiscriminadamente el acceso a los ciudadanos no residentes a las vías públicas de las comunidades acogidas a dicho ordenamiento. Para llegar a esta conclusión, el foro a quo validó el control de acceso a la urbanización y la formulación de preguntas dirigidas a identificar a la persona, y sostuvo que la entrada podría ser negada tan sólo cuando existiera motivo fundado o sospecha razonable para creer que el visitante podría cometer un delito en el área restringida.

Sostenemos la constitucionalidad de la Ley sobre Control de Acceso, pero modificamos aquella parte de la sentencia recurrida que resuelve que el único motivo para negar el acceso a un visitante sería la existencia de motivo fundado o sospecha razonable para creer que el visitante podría cometer un delito. Concluimos que la negativa a brindar cierta información puede dar fundamento para denegar la entrada a un visitante.

I

El pleito en instancia consistió inicialmente de dos (2) recursos independientes, que por presentar alegaciones similares fueron oportunamente consolidados por el tribunal de instancia. Dicho foro contó con el beneficio de los alegatos de cada una de las partes, además de la comparecencia del Secretario de Justicia, quien se expresó en apoyo de la constitucionalidad de la ley. Veamos los hechos que dieron pie a la controversia en cada uno de ellos.

A. *Vecinos Unidos, Inc. v. María Luisa Vilá y otros*

En septiembre de 1992, Vecinos Unidos, Inc. (en adelante Vecinos Unidos), entidad compuesta por residentes de la urbanización College Park en Río Piedras, presentó una solicitud ante el Municipio para establecer un sistema de control de acceso en dicha urbanización. Fundamentaron su solicitud en la existencia de una situación insostenible con motivo de la ola criminal que azotaba el área. Su

propuesta incluía la instalación de barreras permanentes que aislarían la urbanización College Park con un único acceso a través de la calle Salerno.

Conforme lo requiere la Ley sobre Control de Acceso, el Municipio notificó la solicitud a las agencias de servicio público correspondientes y celebró vistas públicas para dilucidar la concesión del permiso. A éstas comparecieron residentes de la urbanización Altamesa, contigua a College Park, y residentes del condominio College Park, quienes expresaron su oposición al control de acceso solicitado. Los primeros alegaron que utilizaban las calles Compostela y Salerno como acceso a la avenida Glasgow y que el control de acceso les privaba de tal uso.(1) (Véase el mapa incluido en el Apéndice.) Los residentes del condominio College Park, por su parte, reclamaron la utilización de la calle Alcalá, otra de las calles de College Park, como acceso principal a la Torre B del condominio.

Vecinos Unidos refutó el reclamo de los residentes de Altamesa alegando que éstos contaban con la calle San Ignacio como salida alterna, por lo que el cierre de College Park no les perjudicaría. En cuanto al reclamo de los residentes del condominio College Park, sostuvo que la calle Alcalá constituía un acceso alterno para esos residentes y no el principal, pues la entrada principal de éstos en realidad era otra.

Pendiente una determinación final, el Municipio expidió una orden que autorizaba el cierre *provisional* por sesenta (60) días.(2) Finalmente, con leves modificaciones, dicho

---

(1) Por este mismo fundamento la Autoridad de Carreteras negó su endoso a la parte del sistema propuesto que impediría tal uso.

(2) Esta autorización provisional, al igual que la petición formal, fue impugnada en los tribunales por un grupo de ciudadanos que reclamaba su derecho a continuar utilizando las calles de College Park como acceso hasta la avenida Glasgow. Aunque no se trata de una controversia ante nos, es preciso señalar, como bien lo hizo el tribunal de instancia en su decisión, que la ley no contiene la concesión de permisos provisionales.

municipio autorizó el sistema de control de acceso solicitado.([3])

Mediante la Resolución Núm. 75, Serie 1992–93, Municipio de San Juan, 2 de abril de 1993, el Municipio dispuso lo siguiente: (1) mantuvo el cierre de la intersección Santa Inés-Compostela, privando a los residentes de Altamesa de esta vía para acceder a la avenida Glasgow, y (2) dispuso que debía permitírseles a los residentes de la Torre B del condominio College Park el acceso a través de la calle Alcalá.

Inconformes con la resolución emitida, dos (2) residentes de la urbanización College Park y un grupo de vecinos de la urbanización Altamesa solicitaron la revisión judicial al amparo del remedio dispuesto en la Sec. 3(e) de la Ley sobre Control de Acceso, según enmendada, 23 L.P.R.A. sec. 64b(e). Su solicitud en torno a la paralización de los efectos de la resolución les fue denegada.

En su recurso ante el tribunal de instancia, en síntesis, plantearon la comisión de varios errores, algunos de naturaleza estatutaria, otros de carácter constitucional. Alegaron que la autorización se expidió sin cumplir con los requisitos procesales y sustantivos de la Ley sobre Control de Acceso, según enmendada. Además, señalaron que la acción del Municipio concedía privilegios a unos, mientras causaba graves perjuicios a otros, pues los despojaba de su ruta principal y más segura. Alegaron, además, que al ser excluidos de entrar a las calles de las comunidades acogidas al control se lesionaban sus derechos constitucionales, a saber, la igual protección de las leyes, el debido procedimiento de ley en sus modalidades sustantiva y procesal, y el derecho a la intimidad, así como también se estaban

---

([3]) Al así actuar, el Municipio de San Juan rechazó los planteamientos de los residentes de Altamesa puntualizando que dicha urbanización contaba con las vías alternas de entrada y salida que requería la ley. Hizo referencia, además, a una comunicación de la Directora Ejecutiva del Departamento de Obras Públicas Municipal en la que se recomendaba que ciertas calles de la urbanización College Park debían ser utilizadas exclusivamente para el tráfico local debido a su pésimo estado.

concediendo bienes de uso público para uso exclusivo privado, en contravención a nuestra Constitución. Igualmente señalaron que en la medida en que el estatuto autorizaba tal actuación, éste era excesivamente amplio y vago.

Tras expresarse sobre la constitucionalidad de la Ley sobre Control de Acceso, el tribunal de instancia dispuso de la controversia respecto a la urbanización College Park a base de fundamentos de naturaleza estatutaria. Concluyó que, en términos generales, los procedimientos seguidos ante el Municipio cumplieron con los requisitos procesales y sustantivos dispuestos en la ley. Sin embargo, destacó dos (2) aspectos que a su juicio violaban la Ley sobre Control de Acceso.

El primero de éstos estaba relacionado con el cierre de la intersección entre las calles Santa Inés y Compostela, y con la valla para controlar el acceso en la calle Salerno. Según dicho tribunal, estas medidas tenían el efecto de obstaculizar la *continuidad* existente entre la calle Santa Inés y la Compostela, lo que, a su juicio, privaba a los recurrentes de acceso a la avenida Glasgow en contravención a lo dispuesto en la Sec. 1(b) de la Ley *sobre Control de Acceso*, 23 L.P.R.A. sec. 64(b). En cuanto al segundo aspecto, determinó que el establecimiento de barreras en la calle Alcalá y la valla en la calle Salerno tuvieron el efecto de controlar la entrada y salida de la Torre B del condominio College Park, comunidad que no había solicitado el control de acceso.

A la luz de lo anterior, el tribunal a quo resolvió que la erección de estas barreras específicas afectó indebidamente derechos de terceros en contravención a los términos de la Ley sobre lo Control de Acceso, y que, por tanto, debían ser removidas. Sin embargo, por entender que la eliminación de dichas barreras trastocaría todo el sistema de control de acceso de la urbanización, el tribunal revocó la resolución en su totalidad y devolvió el asunto al Muni-

cipio para que se diseñara un nuevo sistema que fuese congruente con lo resuelto.

Inconforme con esta determinación, Vecinos Unidos y el Municipio de San Juan decidieron acudir ante nos.

B. *Asociación Pro Control de Acceso Calle Maracaibo, Inc. v. Nancy Cardona Rodríguez y otros*

El otro recurso se originó cuando residentes de varias calles que colindan y tienen acceso a la calle Maracaibo en la urbanización Park Gardens de Río Piedras, unidos en una entidad de nombre Asociación Pro Control de Acceso Calle Maracaibo, Inc. (en adelante Asociación Calle Maracaibo), presentaron una petición ante el Municipio para establecer un control de acceso en dicha calle. Solicitaron el control de acceso en ambos extremos de ésta, alegando que atravesaban por un grave problema de seguridad por la alta incidencia criminal del área, así como por la contaminación, ruido y congestión vehicular ocasionada por el tráfico que discurría por dicha calle. El Municipio expidió una orden de cierre *provisional* por sesenta (60) días, dejando abiertas las entradas y salidas en las horas de mayor tráfico.

Luego de realizadas las vistas correspondientes[4] y de recibir el endoso de varias agencias, el Municipio emitió la Resolución Núm. 72, Serie 1992–93, Municipio de San Juan, 28 de abril de 1993, en la que finalmente autorizó el control de acceso de la calle Maracaibo. A tenor con los términos de la autorización, una de las entradas sería controlada mediante un portón operado con *beeper* o tarjeta

---

[4] En la vista pública un grupo de vecinos de la propia urbanización Park Gardens y de dos (2) urbanizaciones contiguas a ésta presentó su oposición a la solicitud debido a que utilizaban la calle Maracaibo como acceso más seguro para llegar a sus hogares. Por su parte, el representante del Departamento de Transportación y Obras Públicas manifestó que dicha agencia sólo consideraría favorablemente un cierre nocturno de lunes a viernes. En vista de los planteamientos de los opositores, la Asociación Pro Control de Acceso Calle Maracaibo, Inc. (en adelante Asociación Calle Maracaibo) solicitó enmendar su propuesta para limitar las horas de cierre.

electrónica y la otra por una barrera de metal operada por un guardia de seguridad, además de *beeper* y tarjeta. Se dispuso, además, que el sistema de control de acceso estaría abierto al flujo vehicular general de lunes a viernes de 6:00 A.M. a 7:00 P.M., excepto en días feriados.

Inconformes con la decisión del Municipio, los opositores al control de acceso de la calle Maracaibo, residentes tanto del área controlada como del área circundante, acudieron en revisión judicial. Sus alegaciones eran muy similares a las del caso anterior. Luego de una vista evidenciaria, su solicitud en torno a la paralización de los efectos de la Resolución del Municipio fue denegada.

Finalmente, luego de varios incidentes procesales, entre los cuales estuvo la consolidación de ambos casos, el tribunal a quo emitió sentencia en la que modificó el permiso concedido para la calle Maracaibo en varios aspectos. Primero, determinó que la operación del sistema de control de acceso no debía tener el efecto de excluir a los ciudadanos no residentes de las calles y aceras públicas del área objeto del control. Y segundo, delimitó el ámbito de intervención permitido con los visitantes. Al respecto, sostuvo que la Ley sobre Control de Acceso sería inconstitucional si era interpretada en el sentido de que permitía a las asociaciones de residentes restringir indiscriminadamente el acceso de los ciudadanos no residentes. A juicio del foro recurrido, el ámbito de intervención permisible debía ser similar al establecido para las investigaciones criminales. Por ello, luego de reconocer que la actuación del guardia de seguridad privado contratado por una asociación de residentes constituía una acción estatal, sostuvo que el interés apremiante en proteger la seguridad de los ciudadanos era suficiente para justificar una intervención momentánea con los vehículos y transeúntes que visitan la urbanización,

siempre que fuese mínima y se aplicase uniformemente a todos los visitantes.([5])

Conforme con la sentencia recurrida, la mera detención en la entrada de la urbanización, así como la formulación de preguntas dirigidas a identificar a la persona y a conocer el propósito de su visita eran actuaciones constitucionalmente válidas. No obstante, señaló dicho foro que la contestación a ambos tipos de preguntas debía ser voluntaria y que únicamente podría denegarse la entrada de un visitante a una urbanización cuando existiera motivo fundado o sospecha razonable para creer que el visitante podría cometer un delito de permitírsele el acceso a la urbanización.([6])

De igual modo, sostuvo que la mera negativa a brindar la información requerida no constituía motivo suficiente para negar el acceso([7]) y que establecer la obligatoriedad de brindar tal información restringiría la libertad del ciudadano por lo que se activaría la protección constitucional contra registros, incautaciones y allanamientos irrazonables contenida en la Sec. 10 del Art. II de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1.([8]) Finalmente,

---

([5]) En este contexto utilizamos la palabra "visitantes" para referirnos a todas aquellas personas no residentes que pretendan lograr acceso al área controlada.

([6]) Entendió el tribunal de instancia que la detención y el cacheo, validadas por el Tribunal Supremo federal en *Terry v. Ohio*, 392 U.S. 1 (1967), son separables. Al respecto expresó: "Podría adoptarse una y no la otra, autorizándose la detención momentánea de un individuo, a base de una sospecha razonable, para propósitos de investigación, pero sin permitir su cacheo." Caso Núm. CE-95-91, Parte I, Apéndice, pág. 45, esc. 5.

([7]) En este sentido, el foro a quo expresó en su sentencia: "[D]icha pesquisa es válida cuando la contestación a la misma es de carácter voluntario y una persona prudente y razonable puede comprender que podría negarse a ofrecer dicha información, si así lo desea, sin que ello impliqųe que no se le daría acceso a la urbanización." Caso Núm. CE-95-91, *supra*, págs. 46–47.

([8]) En lo pertinente dispone dicha sección:

"No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.

"Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse." Art. II, Sec. 10, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 299.

resolvió que no podía mantenerse un registro de visitas salvo que *el residente* lo autorizara expresamente. No conforme con esta determinación, la Asociación Calle Maracaibo acudió ante esta Curia.

En un mismo alegato, Vecinos Unidos, la Asociación Calle Maracaibo y el Municipio, imputan al foro de instancia la comisión de dos (2) errores. En el primero de éstos, Vecinos Unidos plantea que el foro a quo erró al revocar la Resolución Núm. 75, *supra*, que autorizó el control de acceso en la urbanización College Park, bajo el fundamento de que el Municipio carecía de discreción para autorizarlo. Como segundo error, todas las partes recurrentes plantean que los parámetros desarrollados por la jurisprudencia en torno al ámbito de intervención permisible por los agentes del orden público para restringir la libertad de los ciudadanos, no son aplicables al tipo de intervención que de ordinario ocurre con los visitantes en las urbanizaciones sujetas a los controles de acceso bajo examen, y que, en consecuencia, tampoco es aplicable la garantía constitucional contra registros e incautaciones irrazonables del Art. II, Sec. 10 de nuestra Constitución, *supra*.

Luego de examinar detenidamente las posiciones de las partes y de analizar el texto de las disposiciones de ley en controversia, consideramos apropiado discutir en primer lugar la controversia relativa a la constitucionalidad de la Ley sobre Control de Acceso. Posteriormente, consideraremos la controversia restante.

## II

En el presente caso, las partes recurrentes cuestionan la determinación del foro de instancia respecto a la aplicabilidad de los parámetros desarrollados por la jurisprudencia interpretativa de la garantía constitucional contra registros e incautaciones irrazonables de la Sec. 10 del Art. II

de la Constitución de Puerto Rico, *supra*, al momento de delimitar el ámbito de intervención constitucionalmente permisible con las personas que solicitan acceso a una comunidad sujeta al régimen instaurado por la Ley sobre Control de Acceso. Aducen que en virtud del poder que les delega la ley, las urbanizaciones tienen la potestad de decidir quién puede entrar a la comunidad y, por lo tanto, pueden negar la entrada a quien no ofrezca la información requerida. Aunque reconocen que existe una intervención con el ciudadano cuando se le solicita el nombre y alguna identificación a la persona que se aproxima, la catalogan como "mínima" y señalan que es el modo menos oneroso a través del cual se puede cumplir con el propósito legislativo de permitir a las comunidades que instauren medidas de seguridad para protegerse de la incidencia criminal.

Los opositores a los controles de acceso, aquí recurridos, por su parte, tampoco están de acuerdo con la determinación del tribunal de instancia. Alegan que para que sea cónsono con nuestro ordenamiento constitucional, el concepto de control de acceso no puede comprender la detención e intervención con un ciudadano por el único hecho de que no es conocido por la asociación o por su representante. A su juicio, los guardias en las entradas de comunidades con acceso controlado pueden obtener mediante sus sentidos aquella información necesaria para salvaguardar su seguridad, como lo sería ver al conductor o a la persona que se aproxima, la marca y el modelo del vehículo, así como su número de tablilla. De igual forma, plantean que la Ley sobre Control de Acceso es inconstitucional de su faz por ser excesivamente amplia y vaga, lo que ha dado margen al abuso constante de los derechos civiles de los ciudadanos por parte de las asociaciones de residentes.

De entrada, es preciso destacar que en el caso de autos los controles de acceso vehicular permitidos por el Municipio requerían que en una de las entradas hubiese un guar-

dia de seguridad operando las barreras de metal.([9]) Por ende, nuestros pronunciamientos están limitados a sistemas de control de acceso vehicular análogos, en los que en por lo menos una de las entradas de automóviles hay una persona o guardia de seguridad. En estricta juridicidad nos abstenemos de hacer pronunciamientos sobre aquellos sistemas que no tengan guardia en una de sus entradas vehiculares.

En la resolución del presente caso, el tribunal de instancia se vio precisado a atender planteamientos constitucionales similares a los esbozados por los opositores al sistema de control de acceso impugnado en *Caquías v. Asoc. Res. Mansiones Río Piedras*, 134 D.P.R. 181 (1993) (en adelante *Caquías*). En aquella ocasión, a la luz de los hechos, adjudicamos la controversia mediante una interpretación estatutaria y no fue necesario dilucidar la validez constitucional de la ley. *Caquías*, supra; *véanse* los casos allí citados. En el caso de marras, en cambio, específicamente se nos solicita que evaluemos el ámbito de intervención constitucionalmente permisible a las asociaciones de residentes, al implantar determinados mecanismos para controlar el acceso, dentro del poder que les fue delegado por la Asamblea Legislativa. En este sentido, nos toca hoy delimitar el ejercicio de dicho poder delegado frente a los derechos ciudadanos.

Como es sabido, una ley puede ser declarada inconstitucional de su faz o en su aplicación. Bajo la primera doctrina, el análisis se circunscribe a determinar si del texto de la ley surge el vicio que la hace inconstitucional.

---

([9]) En el caso de la calle Maracaibo, la Sec. 1ra de la Resolución Núm. 72, Serie 1992–93, Municipio de San Juan, 28 de abril de 1993, dispuso que se autorizaba controlar el acceso: "En la Calle Maracaibo casi esquina Generalife mediante barrera de metal operada por guardia de seguridad y 'beeper' o tarjeta electrónica para los residentes y portón peatonal." Por su parte, la Resolución Núm. 75, Serie 1992–93, Municipio de San Juan, 29 de abril de 1993, en la Sec. 1ra, inciso II, autorizó controlar el acceso a la urbanización College Park, mediante la instalación de un sistema de vallas para controlar el tránsito en la calle Salerno cerca de su intersección con Glasgow que "[t]endrá una caseta para el guardián ...".

Véanse: *U.N.T.S. v. Srio. de Salud*, 133 D.P.R. 153 (1993); *Velázquez Pagán v. A.M.A.*, 131 D.P.R. 568 (1992). Bajo la segunda, es necesario analizar el contexto en el que la ley ha sido aplicada para determinar si tiene el efecto de infringir alguna disposición constitucional.

En el caso de autos, los recurridos alegan, en parte, que la Ley sobre Control de Acceso es inconstitucional de su faz por ser excesivamente amplia y vaga. Sin embargo, no incluyen alegaciones específicas sobre la posible violación de derechos de libertad de expresión y asociación. Como se sabe, la doctrina que permite examinar un estatuto de su faz se ha utilizado tradicionalmente para examinar legislaciones que se alega infringen las libertades encarnadas en la Primera Enmienda a la Constitución federal y en las secciones análogas de nuestra Constitución. En consecuencia, de ordinario nuestros precedentes derrotarían su pretensión de que abordemos las controversias constitucionales planteadas.

■ Sin embargo, no sería ésta la primera ocasión en que este Tribunal evalúa de su faz una ley sin que se hubiesen alegado violaciones a las libertades protegidas por dichas disposiciones constitucionales. Anteriormente hemos expresado que procede el escrutinio judicial sobre la validez de una ley de su faz en otros contextos en que se afectan derechos fundamentales de la persona. Véanse: *Torres v. Castillo Alicea*, 111 D.P.R. 792, 800–801 (1981); *Rodríguez v. Depto. Servicios Sociales*, 132 D.P.R. 617 (1993); *ELA v. Sucn. Gautier*, 81 D.P.R. 580 (1959).

La naturaleza de la controversia ante nos requiere un pronunciamiento inmediato por parte de este Tribunal. A modo de excepción, estimamos que es preciso examinar la constitucionalidad de su faz de la Ley Núm. 21, *supra*, por varias razones.

■ Los opositores al control de acceso en el caso de autos alegan que éste incide sobre sus derechos a la intimidad y libertad de movimiento, los cuales son derechos de

considerable arraigo en nuestra sociedad democrática. Como veremos, la Ley sobre Control de Acceso hace una delegación a las asociaciones de residentes para que regulen el acceso a ciertas vías públicas mediante el establecimiento de mecanismos de aplicación general. Al ejecutar esta facultad, las asociaciones de residentes establecen medidas que limitan e impiden el ejercicio de tales derechos por parte de la ciudadanía. Así, la mera presencia de un guardia en una vía pública de una urbanización puede tener el efecto de inhibir el que la ciudadanía opte por transitar por ella y deje de utilizar las instalaciones que allí se encuentran, a pesar de la naturaleza pública de las vías e instalaciones cuyo acceso ha sido controlado. En este contexto, en los autos del caso contamos con alegaciones lo suficientemente concretas al respecto y con disposiciones reglamentarias que inciden sobre los derechos de intimidad y libertad de movimiento en ese ámbito como para que ejerzamos el escrutinio constitucional solicitado.

■ Por otro lado, no albergamos duda de que al permitir que una comunidad controle el acceso a vías públicas, la Ley sobre Control de Acceso limita y, en ciertas circunstancias, inhibe la libre difusión de ideas y la plena libertad de expresión de aquellos grupos que resultarían excluidos bajo una operación del control de acceso que no garantice adecuadamente estos derechos de la ciudadanía. La exclusión de estos grupos de áreas tradicionalmente concebidas como foros públicos presenta un potencial problema de lesión al derecho a la libertad de expresión, que nos obliga a examinar de su faz el estatuto y los reglamentos impugnados.

■ Finalmente, la importancia excepcional que reviste la Ley sobre Control de Acceso como instrumento gubernamental para prevenir la criminalidad refuerza la contención de que un análisis constitucional de su faz de la Ley sobre Control de Acceso resulta inevitable. El cierre de vías públicas y la consiguiente exclusión indiscriminada de

la ciudadanía como medida para atender las necesidades de seguridad pública de múltiples comunidades en todo el país constituye un mecanismo cuyas implicaciones sociales y jurídicas alcanzan dimensiones aún insospechadas, por lo que el asunto planteado ante nos amerita un pronunciamiento por parte de este Tribunal sobre la validez constitucional de su faz del estatuto impugnado. Además, en ausencia de una actuación legislativa que defina el ámbito de intervención permisible al controlar accesos como el de autos, tenemos la ineludible obligación de expresarnos en este caso.

Debemos destacar que, además de los derechos constitucionales antes señalados, los recurridos plantean que la Ley sobre Control de Acceso viola la cláusula de igual protección de las leyes y les priva de sus derechos libertarios y propietarios sin un debido proceso de ley. De igual forma alegan que la ley contraviene la Sección 9 del Artículo VI de nuestra Constitución, L.P.R.A., Tomo 1, referente al uso de fondos públicos. Examinemos en detalle estos señalamientos.

A. Bajo nuestro ordenamiento constitucional nada impide que la Asamblea Legislativa delegue poderes a entidades privadas, tales como el poder para administrar o implantar una ley. Lo único que le está vedado delegar, en ausencia de autorización constitucional, son aquellas funciones estricta y exclusivamente legislativas y judiciales. Una delegación de poder a personas privadas tiene que ser razonable, en atención al propósito o meta que persigue la ley a la luz de sus circunstancias particulares. A su vez, la razonabilidad de la delegación depende de varios aspectos: (1) que la Asamblea Legislativa haya inicialmente decidido las cuestiones fundamentales de política pública relevantes al esquema de la ley, y (2) que el estatuto provea criterios o salvaguardas que eviten el ejercicio arbitrario del poder delegado. Estas últimas no tienen que mencionarse expresamente en el estatuto,

siempre y cuando puedan ser razonablemente determinadas del esquema de la ley. Véase 16 *Corpus Juris Secundum* Secs. 137, 141 (1984).

■ En el caso de autos, la Ley sobre Control de Acceso delega poder tanto a los municipios como a las asociaciones de residentes para poner en vigor la legislación. Los primeros son los encargados de reglamentar y conceder los permisos conforme a unos procedimientos y criterios esbozados en la propia ley y en el Reglamento de Planificación Núm. 20, Junta de Planificación, 20 de enero de 1989. Por su parte, las asociaciones de residentes, una vez organizadas y registradas en el Departamento de Estado como un consejo, junta o asociación sin fines de lucro, 23 L.P.R.A. sec. 64a(a), han sido facultadas para administrar y mantener los sistemas para controlar el tráfico y el uso de las vías públicas, según éstos les hayan sido autorizados por los diferentes municipios. 23 L.P.R.A. sec. 64d-3(a).

■ Al aprobar este estatuto, la Asamblea Legislativa de Puerto Rico llevó a cabo todas las decisiones concernientes a la política pública. En la exposición de motivos se expresa lo que persigue y la forma en que se pretende lograr dicho propósito. A lo largo de su texto se establecen unos requisitos para la presentación y otorgación de permisos. En relación con los criterios o las salvaguardas que delimiten el ejercicio del poder delegado —en este caso, el ámbito de acción que le será permisible a una asociación al implantar el sistema de control de acceso— éstos están contenidos en la ley sólo parcialmente. Aunque la ley no establece criterios específicos que guíen a las asociaciones respecto a la amplitud del poder delegado —es decir, respecto a cómo controlar el acceso— que se les ha de delegar a los municipios la facultad de definir el sistema que ha de utilizarse y de establecer los requisitos pertinentes y apropiados para cada una de las comunidades.

Esta ausencia de guías no convierte la delegación en inconstitucional.([10]) Como es sabido, siempre que resulte posible suplir las guías de la delegación sin frustrar el propósito de la ley, no la invalidaremos.

En el caso de autos, el esquema general de la ley pauta el ámbito de acción permisible de las asociaciones al controlar el acceso. Al constituir una delegación de poder, la asociación se limitará al ejercicio del poder delegado. De igual forma, el hecho de que la Ley sobre Control de Acceso constituya una delegación de poder estatal implica que un individuo o una asociación no puede, amparado bajo el manto de conducta privada, violar los derechos individuales garantizados por la Constitución ni causar perjuicio o daño a otros mediante el ejercicio del poder delegado. En la medida en que se está controlando el uso de bienes públicos, la facultad conferida a las asociaciones de residentes está delimitada por los mismos parámetros que limitan las actuaciones del Estado. Por ende, si algún reglamento aprobado por alguna asociación de resi-

---

([10]) El hecho de que la Ley sobre Control de Acceso no contiene el ámbito de acción que le será permisible a una asociación, al controlar el acceso de los no residentes, no la invalida por inconstitucional, como sostienen los recurridos. Al igual que cualquier otra ley, ésta tiene que interpretarse acorde con el ordenamiento constitucional y legal dentro del cual opera. Esta legislación no adolece de ningún vicio que la invalide por ser inconstitucional de su faz, ya sea por amplitud excesiva o por vaguedad, contrario al planteamiento en el que insisten los recurridos.

Al referirse a amplitud excesiva y a invalidación de su faz en el contexto de la Primera Enmienda de la Constitución federal, el profesor Tribe señala:

"Of course, almost every law, such as the ordinary trespass ordinance reviewed in *Marsh v. Alabama*, is potentially applicable to constitutionally protected acts; that danger does not invalidate the law as such but merely invalidates its enforcement against protected activity. A plausible challenge to a law as *void for overbreadth* can be made only when (1) the protected activity is a significant part of the law's target, and (2) there exist no satisfactory way of severing the law's constitutional from its unconstitutional applications so as to excise the latter clearly in a single step from the law's reach." (Escolio omitido y énfasis suplido.) L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, pág. 1022.

Según este reconocido profesor, respecto a leyes con esas características, el acercamiento apropiado en la adjudicación constitucional consiste en eliminar gradualmente, a base de un análisis caso a caso, los aspectos inconstitucionales de la ley, invalidando las aplicaciones impropias que se hagan de ella. Tribe, *op. cit.*, pág. 1023.

dentes infringe derechos constitucionalmente protegidos, tal reglamento será invalidado.

Los reglamentos que se aprueben en virtud del poder delegado no pueden resultar onerosos ni irrazonables. Éstos deben limitarse al mínimo necesario de restricciones a los derechos de terceros, sin olvidar que lo único que autoriza la ley es *controlar* el tráfico de vehículos de motor y el uso público de ciertas vías públicas residenciales. En este sentido nos pronunciamos en *Caquías* a los efectos de que:

> ...[E]l permiso que otorga un municipio ... debe interpretarse e implantarse de conformidad con la naturaleza pública de esas vías. ... su uso generalmente no puede hacerse indebidamente oneroso. Toda norma de control de acceso debe ser razonable a la luz de las particularidades de la urbanización en que se vaya a implantar. (Énfasis en el original suprimido.) *Caquías*, supra, págs. 207–208.

Recalcamos, la ley no permite que se impida indiscriminadamente el acceso, sólo autoriza a que se controle, conforme a las circunstancias particulares de cada comunidad.

La delegación efectuada por la Legislatura a las asociaciones de residentes es limitada y debe interpretarse conforme al ordenamiento vigente y al propósito de la ley de proveerle a la ciudadanía un instrumento para prevenir el crimen en sus hogares y vecindarios, teniendo presente la naturaleza de los bienes involucrados y los derechos constitucionales de todas las partes afectadas. Examinemos estos aspectos.

B. El uso de bienes públicos se encuentra regulado por la propia Constitución, la cual impone la obligación al Estado de disponer de las propiedades y los fondos públicos únicamente para fines públicos. Art. VI, Sec. 9, Const. E.L.A., *supra*. A tales efectos la Asamblea Legislativa tiene amplia discreción para determinar lo que constituye un fin público, *P.I.P. v. C.E.E.*, 120 D.P.R. 580, 608

(1988); *P.S.P. v. E.L.A.*, 107 D.P.R. 590 (1978); *P.R. Telephone Co. v. Tribl. Contribuciones,* 81 D.P.R. 982, 996 (1960); *McCormick v. Marrero, Juez,* 64 D.P.R. 260, 267 (1944), y una vez ha hecho tal determinación, los tribunales de ordinario no la invalidarán a menos que sea palpable y manifiestamente arbitraria e incorrecta.

En este contexto, las calles son bienes de dominio y uso públicos independientemente de la jurisdicción bajo la cual se encuentren, sea ésta municipal o estatal. Este carácter público de las calles se desprende de nuestro Código Civil, Arts. 255 y 256 (31 L.P.R.A. secs. 1024 y 1025); véanse, además: *Caquías,* supra; *Rubert Armstrong v. E.L.A.*, 97 D.P.R. 588, 616–618 (1969); *Gobierno de la Capital v. Consejo Ejecutivo,* 63 D.P.R. 434, 458–459 (1944); El *Municipio de Vega Baja v. Smith,* 27 D.P.R. 632 (1919); *Saldaña v. Concejo Municipal de San Juan,* 15 D.P.R. 37, 51 (1909); y se remonta a los tiempos de las partidas del Rey Alfonso el Sabio. *Las siete partidas del Rey don Alfonso el Sabio,* Real Academia de la Historia, Madrid, Eds. Atlas, 1972, T. II, Partida Tercera, Tít. XXVIII, Ley VI y Título XXIX, Ley VII, págs. 711–712, 736.

El propio Código Civil reconoce, además, la existencia de bienes, como los terrenos en donde ubican las carreteras, calles y plazas públicas, "que aunque por su naturaleza son susceptibles de propiedad particular, pierden esta cualidad como consecuencia de la aplicación que de ellas se hace para fines públicos incompatibles con la propiedad privada ...". Art. 274 (31 L.P.R.A. sec. 1082).

El derecho de la ciudadanía al uso y disfrute de los lugares públicos es básico dentro del esquema de valores de nuestro sistema democrático. Sin embargo, esto no significa que los ciudadanos tengan un derecho absoluto a su uso. Véase *U.N.T.S. v. Srio de Salud,* supra. El Estado, en el ejercicio de su poder *parens patriae,* puede válidamente reglamentar el uso que se le dará a las calles

siempre y cuando la reglamentación o legislación adoptada al respecto no interfiera de forma irrazonable con los derechos constitucionales de los individuos.[11] *Pacheco Fraticelli v. Cintrón Antonsanti*, 122 D.P.R. 229 (1988); *véase*, además, la Ley de Vehículos y Tránsito de Puerto Rico, 9 L.P.R.A. secs. 301–1903.

En este contexto, el derecho a la libertad de movimiento o a discurrir libremente por las vías públicas ha sido reconocido como un derecho con valor propio, y no solamente como uno necesario para el ejercicio de otros garantizados constitucionalmente. Véanse: *Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972); *Hague v. C.I.O.*, 307 U.S. 496 (1939). Sin embargo, tampoco es absoluto. El Estado puede reglamentar su ejercicio dentro de los parámetros de nuestro ordenamiento constitucional.

Otro derecho constitucional en juego en la implantación de los controles de acceso del caso de marras lo es el derecho a la intimidad. Art. II, Secs. 1 y 8, Const. E.L.A., L.P.R.A., Tomo 1. Se trata aquí del derecho a la intimidad en la información personal, específicamente en la adquisición de la información, y la retención y el uso de la información adquirida.[12] No es éste el caso de informa-

---

[11] Asimismo, puede adoptar medidas para proteger la seguridad, la salud y el interés general de la comunidad, siempre que las restricciones que puedan causar al derecho de propiedad no sean contrarias al mandato constitucional que impide privar a una persona de intereses libertarios y propietarios sin un debido proceso de ley. *E.L.A. v. Márquez*, 93 D.P.R. 393 (1966). Ya desde 1963 el Secretario de Justicia reconoció que, como regla general, no hacía falta una previa autorización para utilizar bienes que fueran de dominio público. Sin embargo, reconoció que por razones de seguridad y de orden público podría requerirse una autorización previa del municipio para poder usarlos para determinadas actividades. XXXIV (Núm. 1963–13) Op. Sec. Just. XXXVII (Núm. 1966–39) (1963), reiterado en Op. Sec. Just. 200 (1966).

[12] En la jurisdicción federal, véanse: *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977); *Whalen v. Roe*, 429 U.S. 589 (1977). Varios Tribunales de Circuito de Apelaciones han utilizado el análisis de balance de intereses como criterio de revisión a seguirse en casos de derecho a la intimidad en la información. *Plante v. González*, 575 F.2d 1119 (5to Cir. 1978); *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570 (3er Cir. 1980); *J.P. v. DeSanti*, 653 F.2d 1080 (6to Cir. 1981); *Barry v. City of New York*, 712 F.2d 1554 (2do Cir. 1983); *Tavoulareas v. Washington Post Co.*, 724 F.2d 1010 (Cir. D.C. 1984). Véase, además, A.F. Westin, *Privacy and Freedom*, Nueva York, Ed. Athenem, 1968, págs. 330–399.

ción sobre la vida íntima y familiar, la cual merece la mayor protección, *Arroyo v. Rattan Specialties, Inc.*, 117 D.P.R. 35 (1986); *Figueroa Ferrer v. E.L.A.*, 107 D.P.R. 250 (1978), sino de información que se deriva del movimiento de los ciudadanos por las vías públicas del país, ciertamente merecedora de una protección menor.

Hemos afirmado que el derecho a la intimidad no se ejerce de ordinario en el vacío, sino en el centro mismo de nuestros vecindarios y, por ende, su práctica no está inmune a la intervención moderadora del Estado. Al respecto, debemos tener presente que la intromisión en la intimidad ciudadana de ordinario sólo debe tolerarse cuando así lo exijan problemas apremiantes de salud y seguridad pública. Véanse: *Pueblo v. Figueroa Navarro*, 104 D.P.R. 721 (1976); *E.L.A. v. Hermandad de Empleados*, 104 D.P.R. 436 (1975); *García Santiago v. Acosta*, 104 D.P.R. 321 (1975).

Al adjudicar la controversia de autos debemos, además, tener presente que el Estado tiene la obligación de velar por la seguridad de los ciudadanos y sus propiedades. Por ende, la Asamblea Legislativa tiene plena facultad para adoptar mecanismos dirigidos a proteger a la ciudadanía y a desalentar la actividad criminal.

Al aprobar la Ley sobre Control de Acceso la Asamblea Legislativa ponderó los intereses en conflicto y decidió adoptarla como medida para garantizar la seguridad y tranquilidad de las personas. Véase la discusión sobre los intereses sociales en pugna tras la adopción de la ley, en *Caquías*, supra, opinión de conformidad del Juez Asociado Señor Fuster Berlingeri. Desde este estrado apelativo no nos corresponde expresarnos sobre la necesidad, conveniencia o sabiduría de esta pieza legislativa. Tampoco debemos sustituir nuestro criterio por el de la Asamblea Legislativa, sino únicamente determinar si la Ley sobre Control de Acceso conflige con el ordenamiento constitucio-

nal, si contraviene algún derecho o mandato constitucional.

Un análisis del texto de la Ley sobre Control de Acceso advierte que ésta no autoriza los cierres de las urbanizaciones controladas ni prohíbe el acceso a éstas. Tan sólo pretende regularlo. Por ello, en *Caquías*, supra, pág. 186, advertimos que "[e]l concepto de control de acceso implica que se preserva *la naturaleza pública de las calles residenciales* ...". (Énfasis en el original).

Al permitir algún grado de control sobre el acceso y uso de las vías públicas a las asociaciones de residentes, la Ley sobre Control de Acceso permite cierta intervención con los individuos que quieren entrar a las comunidades controladas. El término *controlar* implica el ejercicio de algún tipo de intervención con el objeto de regular, vigilar o fiscalizar, en este caso, el acceso a las vías. Implica, además, una limitación en el uso de las calles. Sin embargo, trasluce del texto de la Ley sobre Control de Acceso que esta intervención autorizada por la Asamblea Legislativa no equivale a una incautación de la persona, y menos a un registro de ésta. Dicho poder no les fue delegado a las asociaciones de residentes.

Por otro lado, como medida para salvaguardar los derechos de terceros al uso de bienes públicos, la Ley sobre Control de Acceso prohíbe que se le imposibilite o dificulte a los residentes externos de la comunidad el uso y disfrute de facilidades comunales, y para ello provee para la colocación de letreros que identifiquen las instalaciones y facilidades públicas existentes en la comunidad. 23 L.P.R.A. sec. 64b(e). Además, condiciona la concesión del permiso a que se dé fiel cumplimiento a la reglamentación vigente sobre el acceso a las playas y a que bajo ninguna circunstancia pueda impedirse el libre acceso a la Policía, los Bomberos, las ambulancias y otros servicios, ya sean públicos o privados.

De conformidad con lo anterior, estimamos que la determinación tomada por la Asamblea Legislativa no fue irrazonable en la medida en que la Ley de Control sobre Acceso no limita de manera absoluta el acceso a las vías públicas y ciertamente pretende favorecer el interés y bienestar general.

Asimismo, las limitaciones al acceso y uso de las calles públicas que conlleva la implantación de la Ley sobre Control de Acceso no tienen el efecto de interferir con la consciencia, la mente, los pensamientos o los sentimientos del individuo. *Cf. Arroyo v. Rattan Specialties, Inc.*, supra. Tampoco lesionan la zona de autonomía e información que el derecho a la intimidad reconoce. Únicamente reglamenta el uso de unos bienes a los cuales todos los habitantes tienen derecho de uso, en aras de salvaguardar precisamente el sosiego, la paz y la tranquilidad de la vida comunitaria, factores que anteriormente hemos reconocido que son parte del derecho a la dignidad e intimidad del ser humano, derechos de posición preferente en nuestro esquema constitucional. *Pueblo v. Hernández Colón*, 118 D.P.R. 891, 905 (1987); *E.L.A. v. Hermandad de Empleados*, 104 D.P.R. 436, 446 (1975); *Sucn. de Victoria v. Iglesia Pentecostal*, 102 D.P.R. 20 (1974).

En este sentido, tal como lo señalara el tribunal de instancia, en la medida en que el texto de la Ley sobre Control de Acceso no autoriza la exclusión indiscriminada de los ciudadanos que no residen en las comunidades sometidas a este régimen, no existe conflicto alguno con los derechos a la libre expresión y difusión de ideas, ni puede hablarse de discrimen o menoscabo alguno de un interés constitucional. Véase *Caquías*, supra.

Por otro lado, entendemos que la Ley sobre Control de Acceso tampoco viola la igual protección de las leyes. Debido a que la clasificación que, en todo caso, crea esta ley sería una sin sospecha, residente y no residente, el análisis

aplicable sería el de escrutinio racional. Dicha clasificación se justifica a la luz de los propósitos que persigue la ley. Véase *Arlington County Board v. Richards*, 434 U.S. 5 (1977).

■ A la luz de lo anterior, la Ley sobre Control de Acceso constituye una delegación válida de poder estatal a entidades privadas. Sin embargo, corresponde a los tribunales examinar cuidadosamente, caso a caso, la implantación de la ley para evitar que se establezcan controles de acceso que rebasen los poderes delegados o que se autoricen para otros propósitos que no sean los contenidos en la ley.

Aclarado lo anterior, examinemos en detalle cómo las asociaciones de residentes recurrentes han implantado los sistemas de control de acceso que fueron autorizados, para —dentro de ese contexto— interpretar el alcance del poder delegado.

■ C. En los dos casos ante nos, las resoluciones municipales autorizan a las asociaciones de residentes a intervenir con los visitantes para indagar si el propósito para acceder a las calles controladas es legal. Al respecto, las Secs. 7 y 9 de las Resoluciones Núms. 72 y 75, *supra,* las cuales autorizaron los controles de acceso para la calle Maracaibo y la urbanización College Park, respectivamente, igualmente establecen que: "Las calles aquí controladas permanecen bajo el control y jurisdicción de este municipio; por lo tanto se garantizará el acceso de personas que así lo requieran para propósitos legales. La asociación de residentes hará los arreglos para garantizar este derecho y a su vez protegerse de la criminalidad." Sec. 9na, Resolución Núm. 75, *supra,* pág. 3.

Tanto en la calle Maracaibo como en la urbanización College Park, los sistemas de control de acceso implantados funcionan haciendo uso de guardianes de seguridad privados contratados por las respectivas asociaciones de

residentes. Estos guardianes privados se encargan de operar el mecanismo seleccionado, en ambos casos, una valla o portón.

De los autos se desprende que, en el caso de la calle Maracaibo, la persona que opera el sistema implantado pregunta al visitante su nombre y le solicita una identificación. Resolución de la Junta de Directores sobre Instrucciones al Guardia de Seguridad y Forma de Operar el Sistema de Control de Acceso en la Calle Maracaibo, 7 de julio de 1994. Posteriormente le pregunta el propósito de su visita, aunque según el citado documento, la contestación a esta pregunta será voluntaria y no podrá usarse para negar el acceso. Íd. El guardia anotará en un registro la marca del vehículo y el número de tablilla. Íd.

Por su parte, surge de los autos que en la urbanización College Park el guardia de seguridad le requiere a todo vehículo que no tenga adherida la calcomanía al cristal, el nombre del conductor y el número de licencia de conducir. Reglamento de Orden y Seguridad, Vecinos Unidos de C.P., Inc., pág. 5. CE-95-91, Parte I, Apéndice, pág. 250. Le pregunta además la residencia o lugar a donde se dirige y el nombre del residente que va a visitar, mas esta información se provee voluntariamente, por lo que no se impide la entrada a quien se niegue a proveerla. Íd. El guardia procede entonces a anotar en un registro el nombre y número de licencia del conductor, así como el número de tablilla, la marca del vehículo, la hora de entrada y salida, el nombre de la persona que va a visitar, además de la residencia o lugar a donde se dirige. Íd. Sólo cuando conste en actas una autorización por escrito del residente para que sean anotados sus visitantes en el correspondiente registro, puede anotarse dicha información en el registro. Íd.

En términos prácticos, los mecanismos utilizados para controlar el acceso en los casos ante nos, sea portón, valla u otro análogo, suponen un impedimento físico al acceso de aquellas personas que no cuentan con un *beeper* o tarjeta

electrónica, según sea el caso. Dichos mecanismos no implican un cierre de las respectivas comunidades, pues el acceso a éstas se encuentra supeditado al cumplimiento de unos requisitos, solicitados por los guardias de seguridad cuando el visitante se acerca a la entrada del área controlada. En torno a este aspecto de la implantación de la ley, el ámbito de intervención con los visitantes, se traba la presente controversia.

D. En la resolución del presente caso, el tribunal de instancia actuó correctamente al esbozar los parámetros constitucionales a los cuales tiene que circunscribirse la implantación de un sistema de control de acceso. Sin embargo, erró al entender que hacer compulsorio el cumplimiento de ciertos requisitos mínimos para lograr acceso a un área controlada restringía la libertad del ciudadano, lo cual activaría la protección de la Sec. 10 de nuestra Carta de Derechos, *supra*. Por ende, dicho tribunal erró al aplicar la jurisprudencia interpretativa de la Sec. 10 del Art. II de la Constitución del Estado Libre Asociado, *supra*, y de la Cuarta Enmienda de la Constitución de Estados Unidos a la presente situación. No obstante, nuestra decisión no excluye la posibilidad de que la intervención que realice la persona ubicada en las entradas de la comunidad alcance el grado funcional de un arresto o incautación de la persona de forma tal que se active la protección de la Sec. 10 de la Constitución del Estado Libre Asociado, *supra*.

Entendemos que dicha protección constitucional se activaría bajo el supuesto de un arresto realizado por una persona particular, debido a que la Ley sobre Control de Acceso no ha delegado la facultad de registrar ni allanar. Aún si resolviésemos que en la situación particular del caso de marras fuera aplicable la garantía constitucional de la Sec. 10, *supra*, entendemos que la intervención en cuestión no equivale a una incautación de la persona. Se entiende que una persona ha sido incautada, dentro del contexto de la Cuarta Enmienda, sólo cuando a la luz de la totalidad de

las circunstancias que rodean el incidente, una persona razonable hubiera pensado que no estaba en libertad de poder marcharse del lugar.[13] Por ende, en la medida en que el visitante permanece en libertad de evadir las preguntas e irse, no estamos ante una incautación de la persona. Sostenemos que las intervenciones autorizadas en los casos ante nos no activan la protección contra registros e incautaciones irrazonables.

El tipo de intervención que se lleva a cabo en estos controles de acceso entre el guardia de seguridad y el visitante difiere de la que se da entre particulares cuando se trata exclusivamente de bienes privados. La intervención que ocurre en los controles de acceso tiene el propósito de velar por la seguridad de las personas y propiedades dentro de un área en que ubican bienes públicos y privados, y, como vimos, esto es posible en virtud de una delegación del Gobierno y en cooperación con éste.

En la medida en que dicha intervención es de naturaleza preventiva, ésta es parecida a la que se permite realizar en las entradas de parques, estadios, coliseos y otros edificios públicos, ciertas áreas de los aeropuertos y bases militares, entre otras instalaciones públicas. Véanse, a manera de analogía: *Collier v. Miller*, 414 F. Supp. 1357 (S.D. Tex. 1976); *United States v. Moreno*, 475 F.2d 44 (5to Cir. 1973), *cert.* denegado, 414 U.S. 840; *Downing v. Kunzig*, 454 F.2d 1230 (6to Cir. 1972); *Barret v. Kunzig*, 331 F. Supp. 266 (M.D. Tenn. 1971). En los casos citados, se utilizaron mecanismos de seguridad con el propósito de evitar la comisión de actos que pusieran en peligro o atentaran contra la vida y propiedad de determinado número de personas ubicadas en cierta área. Lo crucial al validar los distintos tipos de intervenciones fue si el método utilizado resultaba ser el menos intrusivo con la intimidad.

---

[13] *Pueblo en interés menor N.O.R.*, 136 D.P.R. 949 (1994); *Pueblo v. Ruiz Bosch*, 127 D.P.R. 762 (1991). Véanse, además, a manera de ilustración: *INS v. Delgado*, 466 U.S. 210, 228 (1984); *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

38

Conforme a lo discutido anteriormente, al interpretar el alcance de la intervención que podrá llevar a cabo un guardia de seguridad, el criterio rector debe ser que el medio utilizado sea el que menos interfiere con los derechos ciudadanos antes mencionados sin que se frustre el propósito de la ley. El medio utilizado para controlar el acceso no podrá impedir a terceros, de forma discriminada, el uso y disfrute de las vías, las aceras, los parques y otras instalaciones públicas que ubiquen dentro del área. Así tampoco podrá interferir irrazonablemente con la intimidad de los que transitan por las vías públicas.

Para salvaguardar los intereses y derechos de los visitantes, las indagaciones que podrá realizar el guardia de la entrada de los sistemas de control bajo examen se limitarán a preguntar el lugar o destino hacia donde se dirige el visitante o, en su defecto, el propósito de la visita.([14]) En aquellos casos en que el residente haya autorizado el que se indague respecto a la identificación de sus visitantes particulares, el guardia podrá preguntar el nombre del visitante. Estos criterios serán de aplicación, a su vez, en cuanto al acceso peatonal se refiere.

Por otro lado, entendemos que para cumplir con el propósito que se persigue al solicitar una tarjeta de identificación, esto es confirmar la identificación de la persona, existen medios menos onerosos e intrusivos con la intimidad, como lo sería el anotar el número de tablilla del vehículo. Por ello resulta oneroso el que la Asociación Calle Maracaibo y Vecinos Unidos soliciten la licencia de condu-

---

([14]) Además de visitar a un residente, serían propósitos igualmente legítimos, sin pretender ser exhaustivos, lograr acceso a las playas, utilizar las facilidades comunales, ya sean educativas, deportivas, recreativas, instituciones de servicios o de otra índole. Véase 23 L.P.R.A. sec. 64b(e). Sin embargo, a tono con las particularidades de la comunidad y sujeto a un análisis de razonabilidad, podrán establecer horarios nocturnos en los cuales no se podrá tener acceso al área sujeta al sistema de control. Las asociaciones de residentes tienen que tener presente que no podrán denegar el acceso a las calles controladas para el ejercicio de actividades constitucionalmente protegidas.

cir u otra identificación a aquellas personas que interesen entrar a una comunidad con acceso controlado, en automóviles o como peatones.

En lo que respecta a los registros de visitantes, resolvemos que sólo podrá llevarse un registro de determinada información sobre los visitantes de aquellos residentes que así lo hayan autorizado expresamente. Es decir, que para poder llevar un registro de los visitantes de determinado residente, éste tiene que haber consentido para ello. En dicho caso, la información que podrá incluir el registro se limitará a aquella que sea percibida a simple vista,[15] además del nombre del visitante en los casos en que se haya provisto. En aras de reducir el riesgo del mal uso de los datos recopilados, dichos registros serán custodiados por el secretario de la asociación de residentes o por el cargo análogo, quien velará porque no se haga uso indebido de la información contenida en él. El uso que se haga del registro no puede alejarse del propósito que persigue la ley, participar en la lucha contra el crimen y asistir a la labor de la Policía cuando se comete un crimen en el área controlada. Véase Exposición de Motivos de la Ley Núm. 21, *supra*, 1987 Leyes de Puerto Rico, pág. 67. Sólo podrán mantenerse guardados por un período de tiempo razonable limitado, transcurrido el cual serán destruidos.

En atención a todos los derechos e intereses implicados, en aras de lograr el mejor balance entre éstos, establecemos que en la implantación de los sistemas de control de acceso de marras, constituye una condición esencial notificar o advertir a todo potencial visitante de los requisitos que se le pedirán en la entrada, con el propósito de minimizar la intervención con los visitantes. De esta manera, si el visitante no está de acuerdo con ellos

---

[15] Tales serían, por ejemplo, la hora de entrada y salida, y las características del vehículo como la marca, el modelo, el color y la tablilla.

puede retroceder antes de detenerse frente a la persona encargada de controlar el acceso.

■ Las personas que se acerquen a áreas acogidas al régimen de la ley deben estar informadas mediante la colocación de letreros que le avisen a una distancia razonable de la entrada que van a tener que parar su vehículos brevemente con el objetivo de indagar su nombre y destino o propósito. Asimismo, dicho letrero deberá indicar la entidad o persona a quien pueden dirigir cualquier tipo de reclamación. Además, en cuanto se acerquen a donde se encuentre el guardia,[16] no tendrán que detenerse durante más tiempo que el que razonablemente toma hacer las mencionadas averiguaciones.

■ Sin embargo, las medidas anteriormente descritas no son aplicables a los vehículos oficiales del Gobierno de Puerto Rico, el Gobierno Federal, Municipal o cualquier vehículo que esté respondiendo a una emergencia. Éstos estarán exentos del proceso de identificación una vez demuestren la tablilla que acredite que es un vehículo oficial. Así, expresamente lo dispone el reglamento del caso de autos y corresponde a las comunidades con estos controles tomar las medidas para asegurar que los vehículos oficiales y de emergencia estén exentos de estos requisitos.

Las medidas discutidas anteriormente constituyen el máximo de intervención que consideramos permisible sin que queden frustrados los propósitos de la ley. Aclaramos que la Asociación Calle Maracaibo y Vecinos Unidos cuentan con un espacio de acción que va desde cero intervención con el visitante hasta el máximo de intervención permisible aquí esbozado. Dentro de estos parámetros, y conforme a las particularidades de cada urbanización, las

---

[16] Dicho guardia de seguridad deberá estar debidamente uniformado e identificado con una placa que incluya su nombre y apellido.

asociaciones de residentes podrán diseñar el sistema de control de acceso que mejor atienda sus necesidades.[17]

Por entender que la Ley sobre Control de Acceso autoriza cierta intervención con el visitante con el propósito de controlar el tráfico vehicular y el uso público de ciertas calles, y que este tipo de intervención no activa la Sec. 10 de la Constitución, *supra*, revocamos aquella parte de la sentencia que establece una analogía con las investigaciones de carácter criminal y concluye que únicamente podría denegarse la entrada a un visitante si se cuenta con motivo fundado o sospecha razonable de que el visitante podría cometer un delito. Revocamos también la determinación del tribunal de instancia que resuelve que la omisión de brindar cierta información, de por sí, no puede dar base para excluir del acceso a una comunidad o urbanización.

Aunque entendemos que la sociedad está dispuesta a tolerar un tipo de intrusión mínima con su libertad e intimidad, el hecho de que nos inclinemos a favor del bienestar y la tranquilidad de las familias en sus hogares no significa que favorezcamos cualquier medio para alcanzar el propósito de la ley. Conscientes de que la coartación de libertades como medida preventiva nunca ha sido bien vista, debe optarse por el método que sea menos invasor a la intimidad del visitante. Sostenemos la validez de cierta intervención con el visitante siempre y cuando ésta se ajuste a lo aquí esbozado, en aras de salvaguardar los derechos de todas las partes involucradas.

Por todo ello, modificamos los sistemas de control de acceso implantados en la calle Maracaibo y en la urbanización College Park, por la Asociación Calle Maracaibo y por Vecinos Unidos, respectivamente, respecto al máximo de intervención permisible con los visitantes. Los sistemas implantados deberán ser atemperados a lo aquí resuelto,

---

[17] A tales efectos, podría optarse por tener unos requisitos menos rigurosos durante ciertos días a la semana o ciertas horas del día o por no controlar el acceso durante cierto horario en que las calles sean utilizadas como rutas alternas.

de forma tal que se garanticen los derechos de los visitantes.

## III

Según expresamos anteriormente, no resta resolver la controversia sobre la actuación del tribunal de instancia al resolver que el sistema autorizado. para la urbanización College Park era contrario a la ley por dos (2) razones: (*a*) por controlar el acceso en una comunidad que no había solicitado el sistema, la Torre B del condominio College Park, y (*b*) por obstaculizar la continuidad de la calle Santa Inés, privándose así a los residentes de la urbanización Altamesa del acceso a la avenida Glasgow, en cuyo caso consideró apropiado revocar la totalidad del permiso.

Respecto al primer planteamiento, basta señalar que éste se ha tornado académico. Existe un acuerdo de estipulación entre Vecinos Unidos y College Park Associates, S.E., propietaria de las Torres A y B del condominio College Park, en el cual se pactó el acceso de los residentes del condominio a través de las calles de College Park.[18]

El segundo planteamiento requiere mayor consideración. Vecinos Unidos nos señala que las enmiendas introducidas en 1992 a la ley permiten el establecimiento de controles de acceso en comunidades cuyas calles se utilicen como acceso a otras comunidades o urbanizaciones, siempre que éstas tengan vías alternas de entrada y salida. Ésta fue la interpretación que hizo el Municipio al refutar las objeciones de la Autoridad de Carreteras para endosar la parte del sistema propuesto que impedía a los vecinos de

---

[18] En relación con este asunto, tomamos conocimiento judicial de la sentencia por estipulación dictada por el Tribunal de Primera Instancia, Sala Superior de San Juan, el 23 de enero de 1995, en el caso *Vecinos Unidos, Inc. v. College Park Associates, S.E.*, Civil Núm. KAC 93-1043. Esta sentencia recogió la estipulación acordada por las partes le otorgó a los residentes del Condominio College Park, Torres A y B, los mismos derechos e igual trato que el otorgado a los residentes de la Urbanización College Park en la Resolución Núm. 75, *supra*, emitida por el Municipio. En tal sentido, dicha resolución quedó enmendada.

la urbanización Altamesa el acceso hasta la avenida Glasgow y finalmente conceder el permiso.

Asimismo, el Municipio sostiene que el fundamento expuesto por la Autoridad de Carreteras para negar su endoso a parte de la propuesta en términos de que se estaría obligando a los residentes de Altamesa a utilizar una ruta mucho más larga en contra del Reglamento de Planificación Núm. 20, *supra*, no es válido a la luz de las enmiendas sufridas por la ley en 1992. Aduce que al otorgar el permiso, el Municipio correctamente examinó las alternativas de acceso a la urbanización Altamesa.

Por su parte, los residentes de Altamesa presentaron, como impedimento estatutario para el cierre del sector, la existencia de una vía continua que durante treinta (30) años ha servido a los residentes de la urbanización Altamesa como ruta de acceso a la avenida Glasgow.

Evaluemos sus planteamientos.

A. En 1992 el esquema legal que hasta entonces regulaba las características que debe reunir el sector que interese controlar el acceso fue objeto de enmiendas para permitir que comunidades que hasta el momento se veían impedidas de establecer controles de acceso pudieran beneficiarse de éstos. Véase Ley Núm. 22 de 16 de julio de 1992 (3 L.P.R.A. sec. 64 *et seq.*).[19]

Un examen del estatuto advierte que la ley permite la otorgación de permisos aun cuando resulten afectadas

---

[19] En su origen, únicamente cualificaban para controles de acceso aquellas áreas que tuvieran un sólo acceso o que teniendo más de uno, ninguno de ellos constituyera una vía de paso o de comunicación por el que se tuviera que transitar para llegar a otras comunidades. Exposición de Motivos de la Ley Núm. 21 de 20 de mayo de 1987, Leyes de Puerto Rico 67. Al aprobarse la Reforma Municipal en 1991, la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991 estableció que la comunidad interesada en solicitar un control de acceso tenía que ser aislable dentro del área geográfica en que estuviera ubicada y no podía controlarse, a su vez, la entrada y salida de otra comunidad que no hubiera solicitado el control. Además, dispuso que no podía dificultarse el flujo vehicular y peatonal por calles locales que tuvieran continuidad entre comunidades y barrios del municipio y que no sólo presentaran alternativas para el tránsito a los miembros de la comunidad, sino también para los que residieran en otros sectores. 21 L.P.R.A. sec 4054(o).

otras comunidades.[20] Sin embargo, aun cuando las enmiendas efectuadas en 1992 tuvieron el efecto de ampliar el número de situaciones en las que un municipio puede autorizar el establecimiento de controles de acceso, es evidente que la ley conservó ciertas limitaciones a la concesión de permisos.[21]

En su Sec. 1 (23 L.P.R.A. sec. 64), la ley señala que un municipio podrá expedir autorizaciones para el control de acceso de urbanizaciones cuyas vías se usen como entrada a otras calles o salida de éstas, urbanizaciones o comunidades, *siempre y cuando*:

> (a) La otra calle, urbanización o comunidad tenga vías públicas alternas de entrada y salida ....
> (b) *No se impida, obstaculice o limite a los* propietarios y *residentes de la otra* calle, *urbanización* o comunidad *el flujo vehicular y peatonal por las vías y aceras públicas que tengan continuidad entre las* calles, *urbanizaciones* o comunidades de que se trate. (Énfasis suplido.) 23 L.P.R.A. sec. 64.

El texto del inciso (a) resulta claro de su faz. Respecto al inciso (b) (23 L.P.R.A. sec. 64(b)) su análisis requiere precisar, en primer término, si se trata de una vía que tiene *continuidad* entre las urbanizaciones o comunidades en cuestión. De ser ése el caso, habría que determinar si se está impidiendo, obstaculizando o limitando el flujo vehicular a los residentes de la otra urbanización o comunidad.

---

[20] Cuando el inciso (a) considera la existencia de alternativas como la utilización de otras rutas alternas o la concesión de iguales derechos de acceso a los residentes de la comunidad afectada, lo único que hace es establecer que contrario a lo que dispone la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991, el efecto negativo sobre otras comunidades no excluye la concesión de una autorización.

[21] Además de las limitaciones impuestas por ley, los municipios deben considerar los reglamentos que al respecto adopte la Junta de Planificación de Puerto Rico, 23 L.P.R.A. sec. 64, de conformidad con la Ley sobre Control de Acceso. En este sentido es de aplicación el Reglamento de Planificación Núm. 20 ("Reglamento de Control de Tránsito y Uso Público de Calles Locales"), Junta de Planificación, 20 de enero de 1989. Aun cuando las enmiendas de 1992 incorporaron modificaciones importantes a la Ley Núm. 21, *supra*, el referido reglamento todavía no ha sido atemperado a los últimos cambios de la ley, no tan recientes.

La Ley sobre Control de Acceso no provee una definición de lo que constituye continuidad. Tampoco hemos encontrado reglamento alguno que nos provea una guía de lo que se quiere decir con continuidad en el contexto de vías públicas. Conscientes de que se trata de un área de planificación urbana cuya interpretación podría tener un efecto significativo en materia de flujo vehicular, veamos qué tipo de continuidad entre calles puede activar la prohibición al otorgamiento del permiso.

El término "continuidad" significa, en términos generales, la unión natural que tienen entre sí las partes del continuo. *Diccionario de la Lengua Española*, 21ra ed., Madrid, Ed. Espasa-Calpe, 1992, pág. 391. A su vez, el hecho de que algo sea continuo implica que se extiende sin interrupción. Al determinar qué vías se reputarán continuas en el contexto de la Ley sobre Control de Acceso, es necesario considerar tanto la naturaleza física de las vías en cuestión como el historial del flujo vehicular en éstas.

En relación con la estructura física de las calles, no se trata de que exista una mera conexión física entre calles. De ser ése el único factor que se ha de considerar, como señaló el tribunal de instancia, *todas* las vías públicas de nuestra jurisdicción tendrían una "continuidad" de este tipo con alguna calle o camino. Se trata, más bien, de vías que fueron diseñadas como arterias que sirvieran para comunicar o conectar barrios, comunidades, avenidas o sectores entre sí; de calles que no terminan o "mueren" en la urbanización que ha de ser controlada. Se trata, además, de vías a través de las cuales los vehículos pueden transitar y discurrir con fluidez de un sector a otro sin tenerse que desviar a calles de menor importancia para llegar a determinado lugar.

Si se determina que nos encontramos ante una vía que satisface la anterior descripción de continuidad, procede evaluar si tradicionalmente ha sido utilizada como una vía principal o si el patrón de flujo vehicular a través

de ella la ha convertido en una vía importante o principal. En este sentido, habría que examinar su historial de flujo vehicular. Para ello consideramos imprescindible la realización de los estudios de tránsito pertinentes con el propósito de determinar si el sistema propuesto impediría, obstaculizaría o limitaría dicho flujo vehicular. Por considerar que se trata de un área neurálgica de planificación y que los municipios de ordinario no cuentan con la pericia necesaria para hacer ese tipo de determinación, debe otorgarse gran deferencia a la recomendación que emita la agencia especializada al respecto, en este caso la Autoridad de Carreteras adscrita al Departamento de Transportación y Obras Públicas, antes de la realización de los estudios pertinentes.([22])

▬ Al exigir este análisis, la ley pretende que la instauración de controles de acceso en comunidades no represente una interferencia irrazonable para el flujo vehicular. El ordenamiento creado por la Ley sobre Control de Acceso no pretende ceder a grupos de individuos o asociaciones de residentes el control estatal del flujo de vehículos en vías principales o de vías que tradicionalmente se han utilizado para conectar entre sí sectores importantes de nuestros pueblos. Por ello, aun cuando una comunidad cuente con las vías alternas de entrada y salida, según dispone el inciso (a), si el establecimiento de portones o barreras tiene el efecto de "controlar" una vía que conecta a sectores importantes y de flujo vehicular constante de forma tal que lo

---

([22]) Como correctamente señalara el tribunal de instancia, la transferencia al nivel municipal del poder de otorgar permisos para controlar el acceso, persigue lograr una mayor agilización y conferir mayor sensibilidad hacia los valores locales en este tipo de decisión gubernamental. No se trata de arrojar por la borda todos los controles centrales existentes, sino que se requiere el desarrollo y la utilización de criterios uniformes con miras a armonizar estas decisiones con la política y metas de largo alcance en la planificación urbana de nuestra sociedad. Conviene señalar, además, que en el informe emitido por el Grupo de Trabajo Control de Acceso de Calles y Urbanizaciones se recomienda convertir en requisito mandatorio el endoso del Departamento de Transportación y Obras Públicas para que el municipio pueda autorizar el cierre.

obstaculiza o limita, el inciso (b) de la Sec. 1, *supra*, obliga al municipio a denegar el permiso.

 Por otro lado, el hecho de que la comunidad interesada en controlar el acceso de vías que se usen como entrada o salida a otras comunidades cumplan con las condiciones establecidas en la Sec. 1 de la ley, *supra*, no obliga al municipio a conceder un permiso. Hay otros aspectos que deben ser examinados. En este sentido, debe considerarse la razonabilidad del sistema solicitado en relación con el efecto negativo que pueda tener en la comunidad afectada y en el interés público. Además, deberá evaluarse la naturaleza de las vías públicas alternas de acceso que queden disponibles (condiciones de seguridad, tamaño, efectos del cambio en el flujo de vehículos, etc.) y si éstas constituyen una alternativa onerosa a la comunidad afectada. De hecho, una lectura de la ley advertirá que ésta expresa que el Municipio *podrá* autorizar el cierre en las circunstancias que se satisfagan los requisitos de la Sec. 1, *supra*, no que deberá concederlo. De este modo, si la gravedad de los efectos negativos a la otra comunidad amerita o no la denegación, es discreción del municipio y como toda determinación administrativa sujeta a revisión judicial, no se revocará a menos que no esté debidamente sustentada en el expediente. *Fuertes y otros v. A.R.Pᴇ.*, 134 D.P.R. 947 (1993).

Examinado y delimitado el término *continuidad* de la Ley sobre Control de Acceso, pasemos a evaluar el caso de las calles Santa Inés y Compostela.

B. De los mapas de la urbanización que constan en los autos se desprende que la calle Santa Inés de Altamesa no termina en dicha urbanización, sino que sirve para conectar esa comunidad con College Park y a su vez con una avenida de importancia. No se trata aquí de una mera conexión física entre calles vecinales. Véase Apéndice. De hecho, la calle Santa Inés no sufre ninguna interrupción en el punto en que comienza a llamarse Compostela y la diferen-

cia entre ellas se debe más bien a que una sección pertenece a la urbanización Altamesa y la otra a College Park.

No empece el hecho de que una u otra vía perteneciera a determinada urbanización desde que fuera construida, lo determinante al evaluar la propuesta de control es la realidad que impera al momento de la solicitud del control de acceso. De la prueba presentada se desprende que el tránsito en esta ruta desemboca finalmente en la avenida Glasgow, una vía principal e importante.

Aunque ciertamente el propósito de las últimas enmiendas a la ley fue ampliar el número de comunidades que cualifican para un sistema de control de acceso, no debemos olvidar que como consecuencia del crecimiento y desarrollo de nuestros pueblos y del aumento en el número de vehículos de motor que discurren por nuestras carreteras, existen áreas residenciales que tienen calles que se han convertido en enlace entre comunidades muy concurridas. En vista de lo anterior, y al evaluar la situación particular de las vías involucradas, estimamos que en el presente caso hay continuidad entre las vías afectadas.

En relación con la segunda parte del análisis del inciso (b) de la Sec. 1 de la ley, *supra*, respecto a si la barrera entre la calle Santa Inés y la Compostela interrumpe el flujo vehicular entre College Park y Altamesa, el expediente ante nos no provee la información necesaria para hacer esa determinación.

Debemos destacar que la Ley sobre Control de Acceso específicamente contiene unas salvaguardas para evitar un impacto detrimental en la congestión vehicular que ya nos aqueja. Estas salvaguardas fueron ignoradas por el Municipio en este caso. En este contexto, al concentrarse en refutar las objeciones de la Autoridad de Carreteras, el Municipio ignoró la segunda limitación respecto a la obstaculización del flujo vehicular en vías que tuvieran continuidad entre las urbanizaciones en cuestión.

Además, es importante señalar que la determinación del Municipio fue tomada en contra de los criterios de la agencia especializada en materia de flujo vehicular sin una justificación basada en las necesidades del tránsito en el área. Esta actuación es contraria a la clara política pública que trasluce la Ley sobre Control de Acceso al intentar integrar a las agencias especializadas en la implantación eficiente de los controles de acceso.

Las limitaciones impuestas por la ley a la otorgación de permisos que afecten a otras urbanizaciones tienen una poderosa razón de ser. Éstas deben considerarse siempre que las vías de la urbanización que solicita el control sean utilizadas para entrar o salir a otra urbanización. Lo contrario sería convertir en letra muerta dicha disposición de la ley. Del expediente no surge que el municipio hubiera evaluado información relacionada al flujo vehicular, aun cuando la comunidad aledaña objetó al cierre mediante los canales provistos por ley para ello, alegando la utilización de las vías que serían "controladas". Reiteradamente hemos expresado que aunque la actuación del municipio de ordinario es merecedora de deferencia, ello no implica una renuncia a la función revisora de los tribunales cuando ha existido una aplicación errónea o arbitraria de la ley. *Fuertes y otros v. A.R.Pe.*, supra; *Murphy Bernabe v. Tribunal Superior*, 103 D.P.R. 692, 699 (1975). Coincidimos con el tribunal de instancia en que la determinación del Municipio no está sostenida por evidencia sustancial en el expediente, visto éste en su totalidad.

Así, pues, por entender que la barrera permanente autorizada por el Municipio en la intersección de la calles Santa Inés y Compostela fue establecida en una calle que tiene continuidad entre College Park y Altamesa, comunidades que no se unieron en la petición del control, y no se contó con la información necesaria para determinar si ésta tiene el efecto de impedir, obstaculizar o limitar el flujo

vehicular por las vías públicas en cuestión, confirmamos el dictamen recurrido y devolvemos el caso al Municipio para que previa realización de los estudios pertinentes reexamine el sistema propuesto.

## IV

 En conclusión, resolvemos hoy que la Ley sobre Control de Acceso, según enmendada, es constitucionalmente válida de su faz. Confirmamos aquella parte de la sentencia que revoca el permiso concedido a Vecinos Unidos para operar un sistema de control de acceso en la urbanización College Park. Revocamos aquella parte de la sentencia que resuelve que como único podría denegarse la entrada a un visitante sería si se cuenta con motivo fundado o sospecha razonable de que el visitante podría cometer un delito. Resolvemos que, no empece el carácter público de las calles, las asociaciones pueden controlar su acceso e incluso negar su uso a quien no se someta a los requisitos mínimos aquí esbozados. La omisión de brindar el destino o propósito de la visita, así como el nombre del visitante, cuando el residente haya autorizado su indagación, puede dar base para no permitir el acceso a una comunidad o urbanización.

 Por su parte, en los sistemas de control de acceso implantados en donde al menos una (1) de las entradas sea controlada por una persona, ésta sólo se limitará a preguntar el destino o, en su defecto, el propósito de la visita. En aquellos casos en que el residente que sea visitado así lo haya autorizado expresamente podrá preguntar el nombre del visitante y anotar dicha información en un registro. Podrá anotarse, además, aquella otra información perceptible a simple vista, como lo sería el número de la tablilla del vehículo. Estos requisitos aplican tanto al acceso vehicular como al peatonal. De igual forma, resolvemos que las asociaciones de residentes deben informar me-

diante avisos al público el tipo de información que se le requerirá a los no residentes de la comunidades acogidas al régimen de control de acceso.

 Reconocemos que la implantación de los sistemas de control de acceso conlleva ciertos ajustes y sacrificios por parte de la ciudadanía. La prevención del crimen, uno de los mayores problemas de la sociedad puertorriqueña contemporánea, la búsqueda del bienestar común y la protección del derecho a la vida y a la integridad física, son propósitos loables del Estado que merecen la realización de ajustes razonables en los estilos y costumbres de los diversos sectores afectados por la ley, en armonía con nuestro ordenamiento constitucional.

*Se dictará sentencia de conformidad.*

El Juez Asociado Señor Rebollo López concurrió con el resultado sin una opinión escrita. El Juez Asociado Señor Negrón García emitió una opinión concurrente y disidente. La Juez Asociada Señora Naveira de Rodón emitió una opinión de conformidad en parte, concurrente en parte y disidente en parte.

# APÉNDICE

Opinión concurrente y disidente del Juez Asociado Señor
 Negrón García.

## I

Hoy, la mayoría del Tribunal finalmente avala la cons-
titucionalidad de la Ley sobre Control de Acceso, Ley Núm.
21 de 20 de mayo de 1987, según enmendada, 23 L.P.R.A.
sec. 64 *et seq.*, que, por delegación válida del Estado, auto-
riza a asociaciones de residentes a establecer sistemas
para controlar el acceso vehicular y peatonal en las vías
públicas dentro de su comunidad. Así lo anticipamos en
nuestra opinión disidente en *Caquías v. Asoc. Res. Mansio-
nes Río Piedras*, 134 D.P.R. 181 (1993).[1]
 En esa ocasión describimos así

> ... el fenómeno explosivo de una dinámica criminosa que ha
> convertido el automóvil hurtado o robado en el instrumento co-
> diciado y favorito de la delincuencia, por la movilidad, facilidad
> y rapidez en que puede desplazarse y huir por las modernas
> vías urbanas.
> El modus operandi de estos delincuentes consiste, dentro o
> fuera de una urbanización, hurtar o robar a mano armada un
> automóvil. Una vez en posesión de éste comienzan una serie de
> asaltos sucesivos a través de esa u otras urbanizaciones. Las
> víctimas pueden ser cualquier hombre, mujer, niño, sea visi-
> tante o residente, que se encuentre en su paso en las calles,
> aceras o patios frontales de las residencias. Incluso, penetran
> peatonalmente y esperan sigilosamente que abran los portones,
> las marquesinas o los hogares para sorprender y así aterrorizar
> al residente o a familias enteras. Como saben que el dueño del
> vehículo hurtado o robado lo habrá notificado a la Policía, para
> evitar ser aprehendidos durante esas fechorías, constante-
> mente se apropian de otros vehículos, a la par que descartan el
> anterior. En ocasiones hieren o asesinan al dueño u otra
> persona. A veces la resistencia ciudadana, a grandes riesgos y
> por excepción, frustra el delito. A menudo estos vehículos son

---

[1] En aquel entonces dijimos:
 *"Anticipamos que aunque tardíamente, en el futuro, la mayoría sostendrá la
constitucionalidad de la Ley Núm. 21, según enmendada, siguiendo en términos ge-
nerales, con lenguaje distinto y algunas modificaciones, el marco conceptual, ideas y
restantes pronunciamientos concebidos y propuestos en esta opinión."*

conducidos a "talleres" o abandonados en sitios deshabitados donde son desmantelados por otros individuos dedicados a esas actividades ilegales.

Es obvio que, en estas rápidas incursiones y giras delictivas, *el uso peatonal y vehicular* irrestricto de las entradas, salidas, calles y aceras no controladas de las urbanizaciones residenciales, *representan el factor más importante que les permite fácilmente transitar, consumar el delito y escapar impunemente.* "Es de conocimiento común que el vehículo ilegalmente apropiado es utilizado por los delincuentes para llevar a cabo fechorías tales como robos, asaltos, escalamientos y asesinatos como un medio para impedir su identificación por la policía." Exposición de Motivos de la Ley Núm. 8 de 5 de agosto de 1987, Leyes de Puerto Rico, pág. 655. Diversos estudios tienden a confirmar la interacción sustancial que existe entre el incremento de *esos delitos* y el consumo y tráfico del alcohol, sustancias controladas o estupefacientes. (Énfasis en el original y escolios omitidos.) *Caquías v. Asoc. Res. Mansiones Río Piedras,* supra, págs. 221–223.

Tres (3) años han transcurrido desde esos pronunciamientos. Con el beneficio de una reflexión y la destilación del tiempo, hemos revisitado nuestros criterios originales. Como resultado, en conciencia nos vemos obligados a *reformularlos* en unos extremos importantes, *aun a riesgo de que se nos tache de inconsistentes.*

Reafirmamos que la Ley Núm. 21, *supra, no constituye una prohibición absoluta* al acceso a las vías y propiedades de dominio público, sitas en estas comunidades. Su lenguaje preserva su naturaleza pública. De su faz, tampoco veda ningún tipo de expresión, pues permite el uso de las calles, las aceras y los parques como foros públicos, con un mínimo de restricciones. Ante la alta e incontrolable incidencia criminal que azota nuestro país, esta medida legislativa propulsa el interés apremiante del Estado de mantener la seguridad y la salud de los ciudadanos. *No obstante, su implantación por las asociaciones de residentes, es inconstitucional, según refrendado por la opinión mayoritaria.*

*Disentimos* de la interpretación mayoritaria de que la intervención con los visitantes no está bajo el manto pro-

tector de la Sec. 10 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1,[2] y la Cuarta Enmienda de la Constitución federal contra registros, allanamientos e incautaciones irrazonables. Opinión mayoritaria, pág. 36. Al no aplicar dicha garantía constitucional, el Tribunal expande el ámbito de la intervención con los ciudadanos, al punto de permitir a un guardia privado inquirir sobre el "destino o [en su defecto el] propósito de la *visita*, así como el nombre del *visitante*, cuando el residente [lo] haya autorizado ...". (Énfasis suplido.) Opinión mayoritaria, pág. 50. *Para la mayoría, negarse a ofrecer esta información es justificación suficiente para impedir el acceso.*

A diferencia de la mayoría, consideramos que ese tipo de detención constituye una intromisión indebida al derecho de intimidad de los ciudadanos que, por su naturaleza, activa la referida garantía constitucional.

En su sustrato, esta decisión es *incompatible* con la reciente opinión en *Pueblo v. Yip Berríos*, 142 D.P.R. 386 (1997). Allí, *con nuestro disentir*,[3] la mayoría anuló, por

---

[2] En lo pertinente, dispone:

"No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.

"Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse.

"Evidencia obtenida en violación de esta sección será inadmisible en los tribunales." Art. II, Sec. 10, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 299.

[3] Allí expusimos con sentido crítico: "Bien sea separados o entremezclados, el área metropolitana —San Juan, Bayamón y Carolina— se compone de distintos núcleos comerciales y residenciales (privados y públicos), conectados por muchísimas calles secundarias, avenidas y expresos, tales como la Ponce de León y Fernández Juncos, en Santurce; la Carretera Núm. 2 hacia Bayamón, la Carretera Núm. 1 hacia Caguas, la 65 de Infantería hacia Carolina, y otras más. *Por esta inmensa red de vías públicas, transitan a todas horas, miles de vehículos.*

"La mayoría del Tribunal hace hoy una abstracción de éstas y otras realidades, tales como el fenómeno del tránsito vehicular; su alta movilidad poblacional; las variadas actividades delictivas que ello genera, y los limitados recursos policiacos. Además, dictamina que es inconstitucional el bloqueo establecido por la Policía en las carreteras que daban acceso al Residencial Virgilio Dávila, en Bayamón, dentro del cual se diligenciaban más de cincuenta (50) órdenes de allanamiento.

"No debemos imponerle a la Policía, como camisa de fuerza judicial, una norma que limite los bloqueos únicamente a las carreteras, las avenidas o los expresos

inconstitucional, un registro por el fundamento de que se trataba de un bloqueo matutino de una vía de acceso, *de carácter provisional, a toda una comunidad residencial*, que reveló un grado de intrusión a la intimidad "de considerable envergadura". Nos preguntamos: ¿cómo es posible validar el sistema de control de acceso —*que no es otra cosa que un bloqueo permanente privado de una comunidad residencial*— *y negarle esa misma facultad a la policía en bloqueos temporeros u ocasionales?* Si ambas actividades son autorizadas por la Asamblea Legislativa y tienen como fines legítimos la lucha contra la criminalidad, ¿cómo establecer y justificar distinto tratamiento? ¿No son de la misma naturaleza preventiva? ¿Bajo qué razonamiento

---

principales y excluya las vías secundarias que comunican directamente las áreas residenciales, ya sean privadas o públicas. Ciertamente, en las avenidas, carreteras principales y autopistas resulta muy difícil e impráctico realizar bloqueos. ¿Van a permitirse éstos únicamente en esas zonas fluidas de gran tránsito? ¿Por qué excluir las calles que dan acceso hacia las áreas residenciales? Si lo hacemos, ¿cómo justificarlo en áreas comerciales o mixtas? Si el bloqueo cumple con las normas jurisprudenciales establecidas por numerosos tribunales, incluso el Tribunal Supremo federal, ¿por qué es *irrazonable* bajo la Constitución?, ¿cuál es la lesión al derecho a la intimidad?, ¿en qué consiste el discrimen?

"Se tacha de ilegal un bloqueo *matutino* de las calles que dan acceso a un área residencial, a base de que afecta la intimidad de los que van a trabajar, llevar los niños a la escuela o realizar otras actividades. *Se trata de una especulación mayoritaria sin base en prueba alguna.* Además, ¿no se dan esas mismas situaciones en el contexto de una mayor proporción vehicular en la zona metropolitana, donde diariamente la transportación hacia el trabajo y la escuela asciende a miles de automóviles e incluye miles de personas, padres y estudiantes? ¿Implica que la Policía sólo puede hacerlo durante el mediodía o la noche? ¿Hay un horario particular constitucional para que la Policía aplique la Ley de Vehículos y Tránsito de Puerto Rico? En ese sentido debe quedar claro que el bloqueo, en el caso de autos, no fue frente a las salidas de unas residencias, como podría mal interpretarse, *sino en plena vía pública.*

"La mayoría le atribuye un gran peso a que se bloquearon las únicas tres (3) vías que permitían la entrada y salida del Residencial Virgilio Dávila. *Bloqueo significa interrumpir y controlar una o varias vías de acceso.* También señala que, como resultado, la Policía detenía a todos los vehículos que intentaran entrar o salir del residencial, sin tener una sospecha particular de que determinada persona hubiese cometido un delito o violado las leyes de tránsito. *Ello no era ni es necesario.* Precisamente, para que un bloqueo sea válido, la abundante jurisprudencia federal y estatal requiere que éste no sea arbitrario ni selectivo; esto es, como regla general, *deben detenerse todos los automóviles que por allí transiten.* Si se detuviera sólo a las personas sospechosas de haber cometido alguna violación a las leyes de tránsito, *no sería menester el bloqueo*, pues las Reglas de Procedimiento Criminal autorizan a un funcionario del orden público a detener sin orden previa a las personas que cometan un delito en su presencia." (Énfasis en el original y escolio omitido.) *Pueblo v. Yip Berríos*, 142 D.P.R. 386, 422–424 (1997).

*restringirle* a la Policía su amplia facultad para intervenir con la ciudadanía por medio de bloqueos de vías que conducen hacia un área residencial, y simultáneamente —ahora sin ser inconstitucional— *conferirle* a un guardia privado, en un control de acceso, la facultad de detenerlo, preguntar los motivos de la visita y, en su defecto, negarle la entrada al ciudadano? *¿No son ambas áreas residenciales? Un control de acceso permanente, ¿no es un método más invasivo a la intimidad que aquel realizado en un bloqueo policial temporero?*

## II

La Sec. 10 de nuestra Carta de Derechos, *supra*, tiene como objetivo principal proteger la intimidad y dignidad del individuo frente a actuaciones arbitrarias del Estado. *Pueblo v. Santiago Alicea I*, 138 D.P.R. 230 (1995); *Pueblo en interés menor N.O.R.*, 136 D.P.R. 949 (1994); *Pueblo v. Martínez Torres*, 120 D.P.R. 496, 500 (1988). Ofrece protección contra *todo tipo de detención personal*, sea un arresto *u otra clase de intervención con la libertad de movimiento*, y contra registros y allanamientos de cualquier propiedad o lugar sobre la cual el individuo tiene una expectativa razonable de intimidad. *E.L.A. v. P.R. Tel. Co.*, 114 D.P.R. 394, 402 (1983); *Pueblo v. Lebrón*, 108 D.P.R. 324, 331 (1979). Véase, además, E.L. Chiesa, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1991, Vol. I, Sec. 6.1, pág. 280.

Su cubierta protectora disuade *la actuación irrazonable del Estado*. Excluye prueba ocupada ilegalmente por los funcionarios del orden público. La razonabilidad de dicha actuación se determina mediante un balance entre los intereses del Estado y el derecho y la expectativa a la intimidad individual.

A pesar de que el derecho a la intimidad constitucional opera *ex proprio vigore*, esto no significa que la Sec. 10,

*supra*, contra registros e incautaciones y la regla de exclusión no requieran de la actuación de los funcionarios del Estado para activarse. Más aún, la Sec. 8 de la Carta de Derechos, Const. E.L.A., L.P.R.A., Tomo 1, "opera por su propia fuerza y vigor" y es oponible entre partes privadas en una acción civil por violación al derecho a la intimidad. *Arroyo v. Rattan Specialties, Inc.*, 117 D.P.R. 35, 64 (1986); *P.R. Tel. Co. v. Martínez*, 114 D.P.R. 328, 339 (1983); *Colón v. Romero Barceló*, 112 D.P.R. 573 (1982).

Bajo la Ley Núm. 21, *supra*, las asociaciones de residentes están encargadas de implantar, operar y administrar los sistemas de control de acceso. 23 L.P.R.A. sec. 64(d). *Obviamente, la intervención con los ciudadanos mediante los mencionados sistemas ocurre por la expresa delegación y cooperación del Estado.* Así lo reconoce la mayoría.

Al respecto, en *Pueblo v. Rosario Igartúa*, 129 D.P.R. 1055 (1992), resolvimos que cuando un ciudadano actúa como agente o instrumento del Estado, o a instancias o en cooperación con éste, *se activa la protección constitucional contra registros y allanamientos irrazonables de la Sec. 10 de la Carta de Derechos,* supra. En cuanto a las intervenciones por individuos privados, citamos con aprobación las siguientes expresiones del Tribunal Supremo de Estados Unidos en *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937 (1982):

> Primero, la privación tiene que ser causada por el ejercicio de algún derecho o privilegio creado por el Estado o por una regla de conducta impuesta por el Estado o por una persona de quien el Estado es responsable .... Segundo, la parte a quien se le imputa la privación tiene que ser una persona de quien razonablemente se pueda decir que es un actor del Estado. Esto puede ser porque es un oficial del Estado, porque ha actuado en conjunto o ha obtenido asistencia significativa de oficiales, o *porque su conducta es de otra forma atribuible al Estado.* (Traducción nuestra, citas omitidas y énfasis suplido.)

La gestión de *naturaleza preventiva* que realizan los guardias de seguridad contratados por las asociaciones de

residentes para la protección de los residentes y las propiedades *privadas y públicas* dentro de la comunidad es una *función pública* que tradicionalmente se le atribuye al Estado. Los guardias privados sustituyen a los agentes del orden público en su labor de prevenir y detectar conducta criminal.[4] *El haber delegado sus funciones a entes privados, no exime al Estado de responsabilidad constitucional. Pueblo en interés menor N.O.R.,* supra. Independientemente del derecho que tienen los ciudadanos al libre acceso a las calles, la Ley Núm. 21, *supra*, autoriza a estos guardias privados a interrumpirles el paso hacia las vías públicas controladas. Consecuentemente, estamos, pues, ante una clara delegación del poder gubernamental. Además, las actuaciones de las asociaciones de residentes en la prevención del crimen están sujetas a las aludidas garantías constitucionales. *Como resultado, los parámetros aplicables a los agentes del orden público cuando le restringen la libertad de un ciudadano, sin orden judicial previa, limitan el ámbito permisible de intervención por una comunidad con control de acceso; sería un absurdo constitucional que los guardias privados tuvieran más facultades que la Policía.*

En *Pueblo v. Pacheco Báez,* 130 D.P.R. 664 (1992), resolvimos que una persona ha sido incautada sólo cuando a la luz de la totalidad de las circunstancias, el modelo de una *persona razonable hubiera pensado que no estaba en libertad de marcharse del lugar. Lo determinante es que la li-*

---

[4] Cabe diferenciar el personal de seguridad privado contratado con el único propósito de proveer protección dentro de un establecimiento o empresa.

Aunque en esas circunstancias, el objetivo del patrono —mantener la operación de su negocio libre de actividad criminal— coincide con un interés gubernamental, ese denominador común en propósitos no convierte al ente privado en un brazo del Estado.

Para activar la protección constitucional, estos guardias privados han de tener un contacto regular con el público y sus funciones deben sustituir aquellas que generalmente realizaría un policía o agente del orden público. Véanse: *Marsh v. Alabama,* 326 U.S. 501 (1946); *Food Employees v. Logan Plaza,* 391 U.S. 308 (1968); *People v. Zelinski,* 594 P.2d 1000 (1979).

*bertad del individuo haya sido efectivamente restringida.* *Pueblo v. Tribunal Superior*, 97 D.P.R. 199, 201 (1969).

Ahora bien, no toda intervención por funcionarios del orden público constituye una detención o un arresto. Puede intervenirse para requerir información, sin restringir la libertad. *Pueblo v. Ruiz Bosch*, 127 D.P.R. 762 (1991).

A pesar de que todo arresto sin orden judicial se presume irrazonable, por excepción se permite cuando el agente tiene "motivos fundados o causa probable para creer que se ha cometido un delito grave en su presencia". Regla 11 de Procedimiento Criminal, 34 L.P.R.A. Ap. II. *Pueblo v. Pacheco Báez*, supra.

Recientemente, en *Pueblo v. Yip Berríos*, supra, pág. 400, la mayoría resolvió, que "[t]anto bajo la Cuarta Enmienda federal como bajo la Constitución de Puerto Rico, la *detención temporera* de una persona que conduce un vehículo de motor por parte de agentes estatales *constituye una incautación de la persona, aún cuando la detención haya sido por un período breve de tiempo o para un propósito en específico*". (Énfasis suplido.)

Dicho caso estableció que "la detención de un vehículo [en un bloqueo de carreteras] por parte de un miembro de la Policía queda enmarcada dentro del imperativo constitucional de que dentro de las circunstancias del caso, tal incautación sea razonable, de forma que no se lesionen los derechos de la ciudadanía". *Pueblo v. Yip Berríos*, supra, pág. 400.

## III

Estos principios, inexorablemente gobiernan la solución de este caso. Es importante señalar que la Ley Núm. 21, *supra*, no establece criterios específicos que delimiten el ámbito de acción de las asociaciones de residentes al operar los sistemas de control de acceso. En consecuencia, una

evaluación de las circunstancias particulares determina la razonabilidad de la intervención con los ciudadanos.

Conforme la Resolución Núm. 72, Serie 1992–93, Municipio de San Juan, 28 de abril de 1993 —que autorizó el control de acceso en la calle Maracaibo— el sistema que se instalaría consistía en una entrada controlada por una barrera de metal, operada por un guardia de seguridad privado, y control remoto o tarjeta electrónica para los residentes. Exigía un portón peatonal.[5] El portón estaría abierto al flujo vehicular de 6:00 A.M. a 7:00 P.M., excepto los fines de semana y días feriados. Además, la resolución ordenaba que debía garantizarse el acceso a toda persona para propósitos *"legales"*, funcionarios gubernamentales y servicios de emergencia. *Por su parte, la Junta de Directores de la Asociación instruyó al guardia de seguridad de la calle Maracaibo a preguntar el nombre y pedir una identificación. Más aún, podría inquirir el propósito de la visita, pero la contestación sería de carácter voluntario y no podría negarse el acceso por este motivo. Finalmente, el guardia tenía autorización a anotar el número de tablilla y la marca del vehículo.*

Según indicado, la mayoría del Tribunal resuelve que esta intervención del guardia de seguridad no constituye una incautación en el contexto de la Sec. 10 de la Carta de Derechos, *supra*, bajo el argumento de que "el visitante permanece en libertad de evadir las preguntas e irse ...". Opinión mayoritaria, pág. 37. Sostiene que el guardia de seguridad podrá preguntarle al conductor el lugar de su destino, o, en su defecto, el propósito de la visita. Opinión mayoritaria, pág. 38. Además, previa autorización de un residente, podrá preguntar y anotar el nombre del conductor. Opinión mayoritaria, pág. 39. También, podrá anotar cualquier otra información que obtenga a través de

---

[5] La calle posee otra entrada con un portón eléctrico activado por control remoto o tarjeta electrónica.

sus sentidos. *También, el Tribunal decide que si el visitante se niega a ofrecer esta información, será causa suficiente para negarle acceso.* Opinión mayoritaria, pág. 50. Finalmente entiende, que solicitar la identificación al visitante es un método excesivo para verificar su identidad, por lo que no podrá requerirse.

Al igual que los bloqueos de las carreteras por la Policía, las comunidades sometidas al régimen de la Ley sobre Control de Acceso interrumpen el libre paso de los ciudadanos a ciertas vías públicas, aunque con un *bloqueo permanente*. En ambos ocurre una detención breve del individuo con el propósito de prevenir y detectar cierta conducta ilegal y adelantar así un interés público. *Estas intervenciones, aunque cortas, constituyen una incautación de la persona. Pueblo v. Yip Berríos,* supra.

Ahora bien, según hemos dicho, no toda intervención por un agente del orden público es una incautación. Éste puede acercarse a un ciudadano en una vía o establecimiento público y solicitarle, si desea, contestar unas preguntas. La persona está en libertad de no contestar la pregunta y *seguir su camino*, por lo que no se restringió su libertad de movimiento.(⁶) *Sin embargo, la situación ante nos es diferente.* Conforme la interpretación mayoritaria, el guardia de seguridad en el control de acceso podrá negarle la entrada al ciudadano *si rehúsa ofrecer su nombre y el propósito o destino de su visita. Desde el momento en que dicha información es condición previa para un ciudadano poder entrar a una vía pública dentro de la comunidad, ha ocurrido una incautación de su persona, pues efectivamente se restringió su libertad de movimiento.* A fin de cuentas, la libertad de movimiento de una persona no sólo implica su potestad de marcharse de un lugar, *sino el libre acceso a*

---

(⁶) Véanse: *Pueblo v. Pacheco Báez*, 130 D.P.R. 664 (1992); *United States v. Medenhall*, 466 U.S. 544, 553–554 (1980); *Florida v. Royer*, 460 U.S. 491, 497–498 (1983).

*las vías públicas, sin que el Estado lo condicione irrazonablemente.* Al igual que en los bloqueos policíacos de carreteras, en que se verifica la identidad del conductor, estamos también ante una restricción a la libertad y, por lo tanto, una incautación de la persona bajo nuestra Carta de Derechos y la Cuarta Enmienda federal.

A pesar de que la detención en los controles de acceso es una incautación de los ciudadanos, el interés gubernamental legítimo de prevenir y detectar conducta criminal en nuestras comunidades permite cierto grado de intromisión en la intimidad.[7] *Como siempre, la validez de la detención estará sujeta al análisis de razonabilidad.* Al conjugar los valores constitucionales en cuestión, por imperativo, la intromisión con la intimidad ha de ser *mínima.* Es unánime el criterio de que la detención debe ser breve y el ámbito de la intervención el menos oneroso y lesivo: sólo lo necesario para la consecución de los objetivos legítimos del Estado. Ello nos sitúa básicamente ante una encrucijada decisoria. Elaboremos.

---

[7] En cuanto a su ámbito, recalcamos que la detención en un sistema de control de acceso ocurre en las vías públicas, las cuales el Estado siempre ha regulado ampliamente. Además, se exige que los vehículos de motor estén inscritos en el Departamento de Transportación y Obras Públicas, y a sus conductores poseer autorización y llevar su licencia de conducir. Ley Núm. 141 de 20 de julio de 1960, según enmendada, 9 L.P.R.A. sec. 301 *et seq.* Asimismo, nuestra ciudadanía está consciente de la constante gestión policíaca en las vías públicas y su obligación de investigar toda posible actividad delictiva que ocurra o pueda ocurrir en su presencia. *Pueblo v. Ortiz Martínez*, 116 D.P.R. 139, 144 (1985). Por lo tanto, se reconoce que esta actividad regulatoria y preventiva de la Policía diluye, en cierta forma, la expectativa a la intimidad que albergan los ciudadanos mientras transitan por las vías públicas.

Otro factor que ha de ser considerado es la proliferación de los sistemas de control de acceso en las comunidades y urbanizaciones de nuestro país. Aunque para muchos estos sistemas pueden ser irritantes y generar ciertos problemas sociales, para otros ha resultado un método efectivo para reducir la criminalidad. De hecho, éstos últimos han llegado a percibirlos con normalidad.

El régimen de control de acceso ha "probado ser un mecanismo eficaz para reducir la incidencia criminal en las comunidades donde se ha establecido; además fomenta una convivencia segura y tranquila entre los miembros de las comunidades, lo que propicia una mejor calidad de vida". Exposición de Motivos de la Ley Núm. 22 de 16 de julio de 1992, Leyes de Puerto Rico, pág. 141.

# IV

Un análisis detallado del esquema de control de acceso nos demuestra que éste se puede implantar de cuatro (4) formas. Una *primera* opción reconoce un ámbito de acción amplio al guardia de seguridad, convirtiendo el sistema de control de acceso en un método efectivo de prevención de la actividad delictiva, requiriendo información y documentación personal que permita una identificación confiable de los que entran en la urbanización. Sin embargo, esa efectividad, como veremos, es a costa del derecho de intimidad ciudadana.

La licencia de conducir es la forma más efectiva de intentar verificar la identidad del conductor. A pesar de esto, la opinión mayoritaria reconoce que el solicitar una identificación es un requisito demasiado oneroso y constituiría una intervención indebida. Opinión mayoritaria, pág. 38. Más aún, el argumento mayoritario de que basta con que el guardia de seguridad anote el número de tablilla del vehículo. *para corroborar la identidad del visitante* es equivocado. *Tomamos conocimiento judicial de la práctica común de los delincuentes de reemplazar las tablillas de sus vehículos o de viajar en automóviles hurtados cuando se embarcan en una empresa criminal.* El interés primordial del Estado es evitar su entrada a las comunidades residenciales. La tablilla, a lo sumo, podría identificar el vehículo y su dueño, luego de que se haya entrado a la comunidad y sólo cuando se realice *a posteriori* una investigación policíaca en el Departamento de Transportación y Obras Públicas. *Nada indica sobre la identidad del conductor.*

Una *segunda* opción sería requerirle al conductor del vehículo que se detenga y provea la siguiente información: su nombre, nombre y dirección del residente que pretende visitar y el propósito de su visita. Negarse a proveer esta información le permite al guardia impedirle acceso al vehí-

culo y a sus ocupantes. Este esquema clasifica a las personas en dos (2) categorías: visitantes y otros. Como sabemos, el *ciudadano* tiene derecho al uso libre de las vías públicas del país. El *visitante* es el "que visita", y *visitar* es "[i]r a ver a uno en su casa por cortesía, atención, amistad o cualquier otro motivo". *Diccionario de la Lengua Española*, 21ra ed., Madrid, Ed. Espasa-Calpe, 1992, pág. 1488. Esa caracterización es el puente conceptual que lleva a la mayoría a *privatizar* las vías públicas residenciales y extender los patios privados y las puertas de las residencias hasta los portones de entrada, controlados por guardias de seguridad privados. La opinión mayoritaria convierte *de iure y de facto* en fincas privadas las carreteras, vías y áreas objeto del control de acceso.([8]) Cuando se parte de la premisa de que sólo los "visitantes" pueden entrar, se configuran así unas violaciones al invertir el derecho de intimidad. Nótese que la mayoría afirma que el residente *puede autorizar* "que se indague respecto a la identificación de sus visitantes" (Opinión mayoritaria, pág. 38), incluso preguntar su nombre. Como única forma de controlar la entrada, ¿vamos a ser tan ingenuos y pensar que los residentes no darán esa autorización? ¿A quién pertenece la expectativa de intimidad en las vías públicas? ¿Es al ciudadano que utiliza la vía pública o al residente que está en su hogar? ¿Cómo, entonces, argüir que la intimidad del ciudadano puede ser violada por autorización del residente? ¿Bajo qué misterioso razonamiento la intimidad del residente es fundamento para violar la intimidad ciudadana en las vías públicas? Obviamente, el derecho de intimidad del ciudadano usuario de las vías públicas del país no depende de una renuncia a la intimidad por quienes no la poseen: los residentes. El análisis mayoritario sería permisible sólo si se tratara de una persona que dentro del patio, toca las puertas e intenta entrar en una residencia

---

([8]) Esta opinión les traspasa a los residentes las facultades de dueño sobre los bienes de uso público detrás del control de acceso.

privada; pero, ¿cómo extenderlo al ciudadano en la vía pública?

La Ley sobre Control de Acceso no tuvo el propósito ni el efecto de privatizar las carreteras, vías y áreas objeto del control de acceso. Atendiendo esta realidad, el ex senador Fernando Martín, en el debate de la Asamblea Legislativa advirtió que ello requería una transformación jurídica mucho más compleja.[9]

El Art. 256 del Código Civil, 31 L.P.R.A. sec. 1025, describe las calles como bienes de uso público en Puerto Rico y en sus pueblos, costeadas por los mismos pueblos o con fondos del Tesoro de Puerto Rico.[10] La Asamblea Legislativa tiene la potestad de enmendar el Código Civil y otras leyes para traspasar las calles residenciales a bienes de uso privado. Claro está, una vez dejen de ser bienes de uso público, su mantenimiento no podrá ser con fondos públicos municipales o estatales. Conllevaría el que con el traspaso de las calles se traspase el costo de mantenimiento de éstas, incluyendo el alumbrado, las reparaciones y la responsabilidad civil sobre éstos. El efecto sería que las calles se convirtieran en bienes de uso común limitado de las urbanizaciones con todas las responsabilidades, obligaciones y problemas que esto conlleva.

Ante estas consecuencias, *no puede obligarse al ciudadano a dar el nombre, mostrar la licencia de conducir ni la*

---

[9] "Nadie en Puerto Rico, no hay ley ésta, ni la anterior, que impida jurídicamente, no digo yo en términos prácticos, uno no vive ahí y ve un guardia, una barrera, se va para otro sitio. Pero nada que jurídicamente impida que yo transite por una calle pública de Puerto Rico sin tener que proveerle explicaciones a nadie mientras sea una calle pública. Y digo esto, en primer lugar, porque es la verdad. Y en segundo lugar, para que aquellos que piensen que esta legislación debe ir más lejos que sepan que habría que hacer enmiendas más profundas." XLIV (Núm. 17) Diario de Sesiones de la Asamblea Legislativa (Senado) 373–374.

[10] La Ley Núm. 21 de 20 de mayo de 1987, según enmendada, 23 L.P.R.A. sec. 64 *et seq.*, sufre lagunas en cuanto al acceso de la ciudadanía a los bienes de uso público dentro de urbanizaciones con control de acceso. Obviamente, esta ley persigue que los residentes tengan control sobre quién entra a su urbanización. Este esquema intenta emular el modelo de los edificios sometidos al régimen de propiedad horizontal, donde los pasillos y el vestíbulo, entre otros, son bienes de uso común limitado. Véase Ley de la Propiedad Horizontal, Ley Núm. 104 de 25 de junio de 1958, según enmendada, 31 L.P.R.A. sec. 1291 *et seq.*

*del vehículo, explicar el motivo de su visita. Esa informa-*
*ción y documentación ha de ser suministrada voluntaria-*
*mente*; dejar de proveerla no podría, por sí sola, invocarse
como razón para negar el acceso. *Condicionar así la en-*
*trada, sería otorgarle al guardia privado más autoridad de*
*la que tiene la Policía del país. También constituye una*
*intromisión irrazonable en la intimidad del ciudadano.*

Implantar estas últimas medidas exige advertencias
claras y debidamente rotuladas antes de detener al
conductor. Si el guardia de seguridad privado, a base de
sus observaciones, información, conducta del conductor y
cualesquiera otros datos disponibles, *llega a convencerse o*
*tuviera motivos fundados para creer que se ha cometido o*
*intentará cometer un delito de permitir el acceso, sólo en-*
*tonces podrá negar la entrada y notificar a la Policía*
*inmediatamente.* Demás está decir que el guardia única-
mente podrá efectuar un arresto en aquellas situaciones en
que una persona particular puede arrestar, conforme la
Regla 12 de Procedimiento Criminal, 34 L.P.R.A. Ap. II.[11]

Una *tercera* opción refrendaría un sistema que permita
la entrada a todas las personas que así lo deseen y que el
guardia de seguridad se limite a tomar la información re-
lacionada con las características externas de: el conductor,
los pasajeros (sexo, señas de identidad, indumentaria, en-
tre otros) el vehículo (tablilla, marca, modelo, año, color,
etc...) y en el caso del peatón, su descripción física. Bajo
esta alternativa, el control no es absoluto y se puede afec-
tar la fase de *prevención de la conducta criminal* que el
Legislador quiso poner en vigor con la aprobación de la Ley
Núm. 21, *supra.* Esta opción reduce parcialmente la posi-

---

[11] Dispone:

"Una persona particular podrá arrestar a otra:

"(a) Por un delito cometido o que se hubiere intentado cometer en su presencia. En este caso deberá hacerse el arresto inmediatamente.

"(b) Cuando en realidad se hubiere cometido un delito grave (*felony*) y dicha persona tuviere motivos fundados para creer que la persona arrestada lo cometió." Regla 12 de Procedimiento Criminal, 34 L.P.R.A. Ap. II.

bilidad de que el guardia de seguridad pueda advertir que el conductor ha cometido o intentado cometer un delito en su presencia (conducir sin estar autorizado; vehículo no tiene el registro debido o está con la tablilla alterada), o tener motivos fundados para creer que realmente se ha cometido un delito grave (presencia de armas visibles; apropiación de un vehículo y otros). Éste sería el método menos oneroso de intervenir con la ciudadanía que desea acceso a una urbanización cerrada.

La *cuarta* opción salvaguarda el interés que promulga el sistema de control de acceso por barreras bajo la Ley Núm. 21, *supra*, como mecanismo de prevención y detección de actividad delictiva —sobre todo, el hurto o robo armado del automóvil (*carjacking*)— erigiendo un obstáculo en la vía pública de modo que todo conductor se vea obligado a usar determinada entrada y salida vigilada, reducir la velocidad y detener brevemente la marcha. Se logra así canalizar adecuadamente el tránsito vehicular de entrada y salida por determinadas calles. El conductor viene obligado a detener el vehículo, momento en el cual el guardia de seguridad puede formularle ciertas preguntas e incluso requerirle su licencia de conducir y registro vehicular *todo ello, voluntariamente.* Cabe señalar que tanto las opciones tres (3) y cuatro (4) protegen el derecho de intimidad de los ciudadanos que transiten estas vías públicas de la forma menos onerosa. No obstante, la cuarta es superior porque adelanta más el interés gubernamental detrás de la Ley sobre Control de Acceso. Al tener el guardia un contacto mínimo con el ciudadano, podría darle acceso a información o impresiones dirigidas a prevenir un crimen y, por consiguiente, alertar a las autoridades para que éstas actúen conforme a su deber.

La concepción de diseño, barreras y obstáculos no es nueva. Por décadas el Departamento de Transportación y Obras Públicas ha usado *badenes*, conocidos como "policías acostados", cuya presencia, en efecto, obliga a reducir la

velocidad del tránsito vehicular. Por analogía, las barreras de control de acceso reducen significativamente la entrada y salida de vehículos. También los detienen brevemente con el propósito más práctico y refinado de que el guardia pueda inquirir y obtener información voluntaria al respecto, recopilar datos percibidos a través de sus sentidos y, ante conducta altamente sospechosa, comunicarse con las autoridades policíacas para que éstas investiguen. De esta forma, se limita grandemente el modus operandi criminoso; se restringe la movilidad, facilidad y rapidez en que podrían desplazarse y huir aquellos delincuentes que usan vehículos propios o hurtados para cometer sus fechorías.

## V

La mayoría reconoce que las calles son bienes de dominio y uso públicos. Opinión mayoritaria, pág. 29. Aun así, pretende justificar la intervención con la ciudadanía a base del argumento de que dicha intervención "es de naturaleza preventiva", parecida a la que se permite en los "parques, estadios, coliseos y otros edificios públicos, ciertas áreas de los aeropuertos y bases militares ...". Opinión mayoritaria, pág. 37. No es necesario mucho esfuerzo mental para advertir que no son equiparables las vías públicas residenciales del país con los parques, los estadios, los edificios públicos y, sobre todo, las bases militares.

Más aún, los parques, las plazas y las calles constituyen foros públicos tradicionales de divulgación y expresión de ideas. Son lugares idóneos para que entidades de escasos recursos económicos, que no tienen acceso a los medios de comunicación masiva (radio, televisión y prensa), divulguen sus ideas. Véase *Pacheco Fraticelli v. Cintrón Antonsanti*, 122 D.P.R. 229, 241–242 (1988).

La Sec. 4 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1, y la Primera Enmienda federal protegen la libertad de expresión en foros públicos. A pesar de que este

derecho no es de carácter absoluto, el Estado sólo podrá reglamentarlo en cuanto a tiempo, lugar y manera, siempre y cuando la reglamentación sea neutral, sobre el contenido y cuando fomente un interés apremiante del Estado. Tampoco puede impedir la existencia de otros métodos de expresión. *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45 (1983); *U.N.T.S. v. Srio. de Salud*, 133 D.P.R. 153 (1993); *Aponte Martínez v. Lugo*, 100 D.P.R. 282 (1971). De hecho, el carácter de foro público tradicional es independiente de su naturaleza residencial o comercial. *Frisby v. Schultz*, 487 U.S. 474, 480–481 (1988).

La opinión mayoritaria guarda silencio sobre este extremo. Debido a la importancia del derecho a la libertad de expresión de *todos* los ciudadanos, es necesario que entre las medidas adoptadas para la implantación del sistema de control de acceso *se garantice la entrada de individuos o agrupaciones que interesen expresar sus ideas o repartir propaganda, o ambas cosas, así como de cualquier otra persona que desee llevar un mensaje a los residentes de esa comunidad.* Sin embargo, tomando en consideración circunstancias en que la convivencia y la necesidad pública así lo requieran, estas actividades se pueden regular. *Rodríguez v. Srio. de Instrucción*, 109 D.P.R. 251 (1979).

— O —

Opinión de conformidad en parte, concurrente en parte y disidente en parte emitida por la Juez Asociada Señora Naveira de Rodón.

En épocas críticas como la que vivimos, de crisis económica, creciente desempleo y alta incidencia criminal que atenta contra la seguridad personal de todos los integrantes de nuestra sociedad, donde los valores sociales parecen estar en proceso de mutación y las instituciones básicas bajo constante asedio, gravita la tentación de anteponer lo que se percibe en un momento dado como un mecanismo rápido y efectivo para obtener un fin legítimo y conjurar uno de los múltiples problemas que acosan

y agobian a nuestra sociedad, aunque esto lleve consigo dar al traste con los valores ético-morales más fundamentales del hombre: su dignidad, integridad y derecho a la intimidad.

Tenemos el deber de resistir esta tentación. (Escolios omitidos.) *Arroyo v. Rattan Specialties, Inc.*, 117 D.P.R. 35, 57 (1986).

Estamos conformes con el acápite III de la opinión mayoritaria, en la que se hace una interpretación estatutaria respecto a la legalidad de un permiso concedido por el Municipio de San Juan, por razón de tener el efecto de controlar el acceso a comunidades que no lo habían solicitado y por contravenir la disposición que impide el establecimiento del control en una calle que tenga continuidad con la de otra urbanización o comunidad. Concurrimos, además, con la determinación respecto a la constitucionalidad de la Ley de Control de Acceso, Ley Núm. 21 de 20 de mayo de 1987, según enmendada, 23 L.P.R.A. sec. 64 *et seq.* Por las razones que expondremos, disentimos, sin embargo, de lo resuelto por la opinión mayoritaria respecto al ámbito de actuación constitucionalmente permisible al amparo de dicha ley. Veamos.

Ante el reconocido problema social relacionado con el alto índice de criminalidad, la Asamblea Legislativa aprobó la Ley Núm. 21, *supra*, "[p]ara autorizar [la concesión de] permisos o autorizaciones para el control del tráfico de vehículos de motor y el uso público de las calles en urbanizaciones o comunidades residenciales públicas y privadas que tengan un solo acceso o que tengan más de un acceso, pero que no constituyan una vía de paso o de comunicación por el que se tenga que transitar para llegar a otras comunidades y para establecer condiciones". Parte introductoria de la Ley Núm. 21, *supra*, 1987 Leyes de Puerto Rico, pág. 67.(¹)

---

(¹) Esta ley ha sido enmendada en dos (2) ocasiones desde su aprobación; primero por la Ley Núm. 156 de 10 de agosto de 1988 (23 L.P.R.A. secs. 64–64b-1, 64c–64d-1, 64d-5–64g), y luego por la Ley Núm. 22 de 16 de julio de 1992 (23 L.P.R.A. secs. 64–64b-2, 64d-3–64d-4, 64e, 64g–64h). En lo sucesivo nos referiremos a la Ley Núm. 21 de 20 de mayo de 1987, según enmendada, 23 L.P.R.A. sec. 64 *et*

La Ley de Control de Acceso tiene el propósito de crear un mecanismo que permita acciones concretas e inmediatas para atajar el problema de la criminalidad. Delega a los residentes de una urbanización o comunidad, constituidos en Consejo, Junta o Asociación, previa autorización del municipio donde radique la urbanización o comunidad, la facultad de establecer mecanismos para controlar el acceso, tanto vehicular como peatonal, a sus urbanizaciones o comunidades. Pretende salvaguardar el bienestar social general en el área de la seguridad.

No nos corresponde desde este estrado pasar juicio en cuanto a aspectos filosóficos sobre los cuales pueda incidir la medida ante nuestra consideración; no podemos decidir la controversia que se nos presenta exclusivamente en atención a estas consideraciones. Éstos son asuntos que competen a la Rama Legislativa del Gobierno, dentro del proceso plenamente político en el que se desarrolla su encomienda. Sobre esta rama del Gobierno recae la importante responsabilidad de desarrollar la política pública en diversas áreas de nuestra sociedad. Una de éstas es sin lugar a dudas la seguridad general. Reconociendo la escasez de los recursos ordinarios con los que cuenta el Estado en nuestra sociedad democrática moderna, no podemos coartar la habilidad de la Rama Legislativa para acudir a medios extraordinarios para lograr el fin deseado.

Nuestra función, sin embargo, tampoco puede ser la de meros observadores silentes. Tenemos una función de trascendental importancia. Desde una perspectiva objetiva, fuera del fragor político que caracteriza las gestiones que efectúan las demás ramas del Gobierno, debemos resolver las controversias que se nos presentan. Cuando, como en los casos de autos, se impugna una ley, ya por su letra o por las actuaciones que se toman a su amparo, debemos anali-

seq., como la Ley de Control de Acceso. Esta ley no aplica a sectores completamente privados. En este sentido especifica la ley que los permisos serán "para el control del tráfico de vehículos de motor y del uso público *de las vías públicas* ...". (Énfasis suplido.) 23 L.P.R.A. sec. 64.

zar la situación y determinar si la ley o las actuaciones concomitantes trascienden el ámbito de lo legítimo. Cuando la impugnación se hace con referencia a la Constitución, la ley fundamental que consagra, entre otros, los derechos personales esgrimibles contra el Estado, de haberse efectivamente trascendido los linderos de lo legítimamente permisible, debemos así declararlo y negarle efectividad a la ley o a la actuación impugnada.

En los casos de autos, varias personas perjudicadas por la implantación de los sistemas de acceso impugnados alegan que la Ley de Control de Acceso es inconstitucional, tanto de su faz como en su aplicación.([2]) Señalan que ella incide impermisiblemente sobre varios derechos constitucionales; a saber, la igual protección de las leyes, el debido proceso de ley, tanto en lo sustantivo como en lo procesal,([3]) y el derecho a la intimidad([4]). Añaden que la ley es constitucionalmente impermisible, dado que transfiere bienes de uso público para fines privados.([5])

Nos parece, sin embargo, que la justa solución de este caso sólo requiere que apliquemos principios propios del debido proceso de ley, en su vertiente sustantiva.([6]) La cláusula constitucional que confiere a la persona la facultad de reclamarle al Gobierno la observancia de un debido proceso de ley tiene su contraparte en las Enmiendas V y XIV de la Constitución federal. *Rivera Santiago v. Srio. de*

---

([2]) Se trata de dos (2) recursos de revisión presentados por residentes de varias comunidades afectadas por los permisos otorgados por el Municipio de San Juan, autorizando el cierre de la Calle Maracaibo de la Urbanización Park Gardens y el cierre de la Urbanización College Park. Los casos fueron consolidados por el entonces Tribunal Superior de Puerto Rico, Sala de San Juan, Hon. Germán J. Brau, Juez de Apelaciones.

([3]) Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1.

([4]) Art. II, Secs. 1 y 8, Const. E.L.A., L.P.R.A., Tomo 1.

([5]) Art. VI, Sec. 9, Const. E.L.A., L.P.R.A., Tomo 1.

([6]) En este sentido coincidimos con la apreciación de la mayoría en torno a la inaplicabilidad de la cláusula constitucional contra registros y allanamientos irrazonables. Art. II, Sec. 10, Const. E.L.A., L.P.R.A, Tomo 1. Ello, sin perjuicio de que las actuaciones de las personas encargadas de implantar los sistemas de control de acceso bajo determinadas circunstancias la hagan aplicable.

*Hacienda*, 119 D.P.R. 265, 273 (1987). Cuando se alega la violación de un derecho fundamental, la cláusula del debido proceso de ley impone la necesidad de que se efectúe un análisis estricto, que no está disponible cuando la legislación incide sobre derechos o intereses de menor jerarquía. Siendo el derecho a la intimidad uno de naturaleza fundamental, que está expresamente reconocido en nuestra Constitución y que merece gran consideración en nuestro sistema democrático de gobierno, debemos aplicar al análisis del presente caso los criterios propios de un escrutinio estricto.

No podemos estar de acuerdo con la caracterización que hace la mayoría de la información que se permite se le exija a una persona para que ésta pueda obtener acceso a una comunidad acogida al régimen de control de acceso. La mayoría entiende que esta información es una "que se deriva del movimiento de los ciudadanos por las vías públicas del país" (opinión mayoritaria, pág. 31), y por ende, "merecedora de una menor protección". Íd. Nada más lejos de la verdad. Ciertamente, el requerirle a una persona tener que dar su nombre, expresar su destino o el propósito de su visita y luego llevar un registro sobre esta información, no equivale ni se trata de "información que se deriva del movimiento de los ciudadanos por las vías públicas del país ...". Íd. Estas actuaciones, que se asemejan a las permitidas y toleradas en los estados policiacos, inciden sobre el fundamental derecho a la intimidad, que en una democracia es un derecho merecedor de un alto grado de protección. Reiteramos, pues, que estamos ante una situación que requiere apliquemos criterios propios de un escrutinio estricto.

El mismo ha sido descrito en varias formas. Supone, en esencia, (1) que la legislación o la actuación impugnada responda a un interés estatal apremiante, (2) que la medida promueva necesariamente la consecución de dicho interés, y a su vez (3) que incida lo menos posible sobre el

interés fundamental protegido. *San Miguel Lorenzana v. E.L.A.*, 134 D.P.R. 405 (1993); *Arroyo v. Rattan Specialties, Inc.*, supra. El análisis realizado de conformidad con estos criterios debe seguir un curso integrado, de forma tal que la determinación a la que se llegue sea el producto de un balance objetivo de los intereses en juego. Es decir, cuando exista un interés apremiante reconocido, si la medida no lo adelanta directamente, ésta debe ser declarada inconstitucional. Si lo adelanta directamente, pero existen otras medidas menos incisivas sobre el interés personal protegido, la medida debe ser igualmente descartada.

Coincidimos con la apreciación de la mayoría a los efectos de que la Ley sobre Control de Acceso, de su faz, es constitucionalmente viable. Ello, porque va dirigida a atender un interés apremiante relacionado con la seguridad pública y porque el mecanismo que adopta, un sistema mediante el cual se faculta a las organizaciones residenciales a *controlar* el acceso a dichas comunidades, adelanta dicho interés, incidiendo lo menos posible sobre intereses fundamentales protegidos. El balance de los intereses involucrados sostiene la validez de la ley de su faz. Es en atención a los medios adoptados por las asociaciones de residentes para poner en práctica la facultad delegada que pueden surgir situaciones que ameriten inclinar la balanza en favor de la protección del derecho a la intimidad.([7]) En relación con estas actuaciones, tomadas al amparo de la referida legislación, debemos aplicar los mismos criterios analíticos al auscultar su viabilidad constitucional.

En este sentido debemos resaltar el tipo de control im-

---

([7]) Entendemos que les son oponibles a las asociaciones de residentes las cláusulas constitucionales invocadas, dado que la actuación impugnada se efectuó de conformidad y por motivo de la facultad que les delegó la Asamblea Legislativa. Bajo estas circunstancias se cumple a cabalidad el requisito de actuación estatal que justifica el análisis constitucional que expondremos. *Pueblo en interés menor N.O.R.*, 136 D.P.R. 949 (1994). Además, estamos ante un planteamiento efectuado al amparo del derecho constitucional a la intimidad, el cual puede hacerse valer contra personas privadas. *Arroyo v. Rattan Specialties, Inc.*, 117 D.P.R. 35 (1986); 4 Diario de Sesiones de la Convención Constituyente 2566 (1951).

plantado por la Asociación Pro Control de Acceso de la Calle Maracaibo, Inc., que es objeto de impugnación en el presente caso. Sus características surgen de una resolución emitida por la Junta de Directores de la Asociación. Dicha resolución dispone, en lo pertinente, lo siguiente:

Toda persona, previo identificarse conforme lo dispuesto en esta Resolución tendrá acceso al área geográfica bajo el sistema de control de acceso con el propósito de uso de las áreas públicas para fines religiosos, cívicos, comerciales, políticos, servicios públicos o privados y cualquier otro legal ....

Por control de tránsito se entenderá como la reglamentación del *movimiento vehicular* en la calle Maracaibo que dispone la orden del Municipio de San Juan ...; pero que no limita el derecho a ninguna persona a seguir disfrutando y usando el área pública (sic) que *caen y estén dentro del sistema de control de acceso* ....

El guardia de seguridad en forma cordial y respetuosa preguntará a la persona su nombre y pedirá su identificación (licencia, tarjeta electoral o cualquier otro [sic] disponible). Luego preguntará el propósito de su visita; *aunque la contestación a esta pregunta es voluntaria y no podrá usarse para negar el acceso.* El guardia anotará en su registro la marca del vehículo y número de tablilla; y en (sic) forma inmediata procederá a dar acceso al ciudadano.

De entender el guardia de seguridad que la conducta del ciudadano es una dirigida o motivada a cometer un acto ilegal llamará en (sic) forma inmediata a la policía estatal o municipal para la investigación pertinente de acuerdo a la ley.

Los vehículos oficiales del Gobierno de Puerto Rico, el Gobierno Federal, Municipal o de emergencia entrarán exentos del proceso de identificación. (Énfasis en el original.) Alegato parte recurrida ante el Tribunal de Primera Instancia, *Exhibit* II, pág. 426.

Al analizar el anterior esquema, la opinión mayoritaria define el campo de acción permisible estableciendo los siguientes parámetros que deberán seguir las asociaciones de residentes al implantar los sistemas: .

1. Deberán poner una notificación que dé aviso adecuado de los requisitos que se le requerirán al conductor, de manera que si no está de acuerdo con ellos pueda retro-

ceder antes de detenerse frente a la persona encargada de controlar el acceso.

2. Igualmente, deberán existir avisos informándole a los conductores de la existencia de un área de acceso controlado y que al llegar al punto de control deberán detener sus vehículos brevemente con el objetivo de indagar su nombre y destino o propósito.

3. La detención en el punto de control no deberá tomar más tiempo que el que sea razonable para hacer las mencionadas averiguaciones.

4. Las preguntas que podrán realizarse se limitarán a: el nombre del conductor, el lugar o destino o, en su defecto, el propósito de la visita.

5. El guardia podrá, además, obtener toda otra información a través de sus sentidos.

6. El guardia podrá anotar toda la información que obtenga mediante los mecanismos consignados en los incisos 4 y 5.

7. Las asociaciones de residentes podrán establecer horarios nocturnos en los cuales no se podrá entrar al área sujeta al sistema de control, aun para propósitos legítimos, ello de conformidad con las particularidades de la comunidad y sujeto a un análisis de razonabilidad.

8. La omisión de brindar cualquier información que le sea requerida puede dar base a que se le impida el acceso.

9. Sólo podrá llevarse un registro de visitas si el residente lo autoriza.

10. Iguales criterios aplican para controlar el acceso peatonal a las áreas sujetas al régimen de control.

El esquema propuesto en la opinión mayoritaria altera el esquema impugnado en los siguientes extremos: exige la ubicación de anuncios informando la existencia del sistema de control y la información que les será requerida; elimina el requisito de proveer una identificación; permite que se establezcan horarios en los que se impida totalmente el acceso; indica que el registro sólo podrá llevarse si el resi-

dente lo autoriza; hace extensivo los criterios para controlar el acceso peatonal a las áreas sujetas al régimen.

Ambos esquemas autorizan que se niegue el acceso al área controlada. El esquema impugnado lo permite cuando no se provea la identificación solicitada, pero hace voluntario el contestar preguntas sobre el propósito de la visita. El esquema adoptado por la mayoría permite que se vede el acceso al no proveerse la información solicitada, haciéndose extensivo dicho efecto a la omisión respecto a proveer información relativa al propósito de la visita. Además, permite que se prohíba la entrada en un horario nocturno designado por las asociaciones de residentes de forma razonable y en atención a las características particulares de la comunidad. Analicemos la legalidad de estos esquemas, a la luz de la ley al amparo de la cual se crean y de los requerimientos constitucionales aplicables a este tipo de situación.

Comenzamos por consignar enfáticamente que a la luz de la delegación efectuada por la Ley sobre Control de Acceso, cualquier esquema que de forma alguna prohíba el paso al área controlada excede la facultad delegada y es, por lo tanto, totalmente impermisible.(8) Control no es sinónimo de exclusión, sino de supervisión ordenada.(9)

---

(8) Así lo reconoce específicamente la opinión mayoritaria. A los efectos, señala en la pág. 19:

"En el caso de autos, el esquema general de la ley pauta *el ámbito de acción permisible* de las asociaciones *al controlar el acceso*. Al constituir una delegación de poder, *la asociación se limitará al ejercicio del poder delegado.*" (Énfasis suplido.)

No vemos cómo, ante estas expresiones, pueda sostenerse un esquema que permita ir más allá del poder delegado, produciendo la exclusión de determinadas personas.

(9) El concepto ha sido definido de la forma siguiente:

"[C]ontrol .... Esta palabra es de origen francés y tuvo originariamente el significado de 'comprobación' o 'inspección'; después se ha hecho internacional y a esos significados se han añadido otros afines. En español se emplea ampliamente, a pesar de haber sido hasta ahora enconadamente combatida por los puristas, con muy variados matices que pueden agruparse en dos acepciones: (1) ('Ejercer, Establecer, Llevar'). Tiene los significados de 'comprobación, *inspección, observación, *vigilancia' y hasta, en algunos casos, "cuenta" o "medida"; en resumen, de acción de mantenerse conscientemente enterado de cierta cosa cuyo conocimiento interesa para determinada finalidad: 'Tiene a su cargo el control de las entradas y salidas en el

Tanto el esquema impugnado como el propuesto adolecen de este defecto: permiten que la entrada al área controlada sea prohibida bajo determinadas circunstancias. Esto, sencillamente, es totalmente impermisible a la luz del alcance de la facultad delegada.

Además, el excluir la entrada por las razones consignadas en ambos esquemas, es decir, por no identificarse o no proveer la información requerida, de forma alguna adelanta el propósito de la ley. Recordemos que ésta permite que se controle el acceso con el propósito de disminuir la incidencia criminal en las áreas controladas. La teoría bajo la cual puede sostenerse la existencia de una correlación directa entre las disposiciones de exclusión en los esquemas reseñados y los propósitos de la ley presupone definitivamente las consideraciones siguientes: que la persona que no provea la información requerida es un criminal; que la persona que la provea no lo es; que toda persona que vaya a entrar a un área controlada durante horas de la noche expresando un propósito que no sea visitar algún residente va a cometer algún delito. No creemos que alguno de estos presupuestos pueda sostener un análisis lógico. Su efectividad es meramente especulativa. No es difícil pensar que una persona que busca acceso a una comunidad restringida, bajo cualquiera de los dos esquemas, podrá lograrlo sin mayores problemas proveyendo información falsa. Esto no se evita requiriéndole una identificación que también puede ser falsificada. Sencillamente, no hay correlación entre los propósitos que busca la ley y los mecanismos propuestos. Se insinúa en la opinión mayoritaria que el mecanismo sirve para disuadir a la persona que considera entrar al área controlada para delinquir. Como hemos visto esta correlación es cuestionable. Lo que es indu-

---

almacén'. 2) Por otro lado, tiene los significados, afines a los anteriores, de 'autoridad, dirección, *dominio, intervención, mando, preponderancia, regulación ...' o sea, de limitación de la libertad o espontaneidad de una acción o fenómeno: 'Los servomecanismos son dispositivos de control automático. Control electrónico'." M. Moliner, *Diccionario de Uso del Español*, Madrid, Ed. Gredos, 1986, Vol. 1, págs. 755–756.

dable, sin embargo, es que el mecanismo tiene otros efectos indeseables, *como impedir injustificadamente* el acceso de personas que no quieren delinquir, pero que tampoco desean revelar asuntos que no le competen a terceros. Existen otros mecanismos menos onerosos que tienen el mismo efecto disuasivo.

Ante el reconocimiento de que los mecanismos propuestos no adelantan de forma alguna los propósitos de la ley, poco importa analizar el grado de intromisión de las medidas en los derechos fundamentales afectados. Ante este reconocimiento nos parece totalmente impermisible avalar cualquier grado de incidencia con los derechos protegidos.

A la luz de los propósitos de la ley y los principios constitucionales aplicables, sostenemos que los sistemas de control de acceso impugnados en los casos de autos deben exhibir las características que discutiremos a continuación. Cabe en este momento efectuar una importante aclaración respecto al alcance de nuestras expresiones. No podemos perder de vista que en el presente recurso tratamos un planteamiento de inconstitucionalidad de una ley en relación con su aplicación. Por lo tanto, el análisis se circunscribe a los hechos particulares que presentan los casos de autos. En este sentido cabe señalar que en los sistemas de control de acceso impugnados existía una persona asignada a la entrada del área controlada. Es por ello que incorporamos este hecho al análisis que efectuamos. Sin embargo, por no estar planteado, no entraremos a considerar si en todas las comunidades de acceso controlado al menos una de las entradas debe tener una persona a cargo de éstas. Veamos las características que a tenor con lo anterior deben presentar los sistemas impugnados.

1. Deben ponerse anuncios que informen de forma visible y clara: (*a*) la existencia del sistema de control, (*b*) que la persona tendrá que detenerse brevemente, y (*c*) las preguntas que se le harán. Este anuncio sirve para que las

personas que se acerquen a un área controlada tengan conocimiento adecuado de su existencia. Además, al informar sobre el ámbito de actuación permitido se reducirá la posibilidad de abusos por parte de la persona que administre el sistema. También, la persona que solicite acceso tendrá conocimiento de los derechos que le amparan.

2. Podrá preguntársele el nombre, el lugar que ha de visitar o el propósito de su visita. *La contestación a estas preguntas deberá ser enteramente voluntaria y la omisión de proveer una contestación a cualquiera de ellas por parte del visitante no podrá utilizarse para prohibirle la entrada a la comunidad o dilatar irrazonablemente su acceso.* El hecho de la voluntariedad de la contestación se consignará también en los anuncios que deberán ponerse, de conformidad con lo indicado en el inciso segundo anterior. Nótese que la voluntariedad en el presente esquema se distingue del que promueve la mayoría, en la medida que este último supone que la persona no tendrá que proveer la información que se le pide, pero en ese caso se le podrá negar la entrada al área controlada.

3. Podrá anotarse el nombre de la persona, el lugar que ha de visitar o el propósito de la visita, de ser provista esta información. Podrá anotarse, además, las características del vehículo en el que transita. La persona a cargo del control podrá notar a base de sus sentidos el color, la tablilla, la marca y el modelo.

4. En todo caso podrán anotarse también las horas de entrada y salida.

5. Se podrá intervenir para detener a la persona, sólo cuando surjan circunstancias que justifiquen un arresto por persona particular bajo la Regla 12 de Procedimiento Criminal, 34 L.P.R.A. Ap. II. Es decir, podrá ser arrestada: inmediatamente, cuando la persona haya cometido o haya intentado cometer un delito en su presencia; o cuando habiéndose cometido un delito grave, se tuvieren motivos fundados para creer que la persona arrestada lo cometió.

6. Tanto bajo las circunstancias consignadas en el inciso anterior, como cuando se tenga alguna sospecha razonable de que se habrá de cometer un delito, se podrá dar aviso a las autoridades policiacas estatales o municipales para que intervengan con la persona.

7. Los registros que se preparen con la información brindada deberán mantenerse custodiados de forma que la información allí contenida no sea divulgada para propósitos extraños al sistema de control de acceso. Después de un tiempo razonable los registros deberán ser destruidos. Debe tenerse presente el propósito limitado de éstos.([10])

Entendemos que el esquema propuesto adelanta directamente los intereses perseguidos por la legislación, sin menoscabar los derechos de las personas. Serviría efectivamente como un filtro, obligando a toda persona que busque acceso a una comunidad a pasar por un punto específico donde habrá una persona que podrá observar a quien entra. El tiempo que tome efectuar las preguntas descritas ofrece oportunidad al guardia para observar al visitante. Por ello, el hecho de que la contestación a éstas sea voluntaria no hace fútil la implantación del sistema. Así tendrá la oportunidad real de identificar cuando exista un peligro potencial. En estas situaciones podrá llamar a las autoridades y dar aviso de lo que ocurre o llamar a alguno de los residentes con el mismo fin. Igualmente, podrá reconocer de inmediato cuando haya ocurrido un delito y dar aviso a las autoridades para que se pueda dar paso a una rápida persecusión e investigación. La persona que controle la entrada a la comunidad puede también ayudar en la investigación de sucesos delictivos y el enjuiciamiento de los responsables. Después de todo, están ubicadas en el único punto por donde entran las personas, por lo que puede ver

---

([10]) *Quaere* si la utilización indebida de la información contenida en los registros pueda dar paso a una acción resarcitoria por los daños y perjuicios que pueda provocar dicha actuación.

los rasgos y características de éstas, el vehículo que manejaban y la hora en que las vio, entre otros.

Estas consideraciones, por sí solas, tienen un efecto disuasivo, operando en la mente de las personas con el efecto de evitar que acudan a la comunidad con la intención de cometer un delito. Es decir, sirve bien el propósito deseado por la Ley sobre Control de Acceso, sin llegar a los extremos de imponer requisitos, cuyo incumplimiento justifique la exclusión de una persona, cosa no permitida por la ley, y que no adelanta razonablemente los propósitos reseñados.

No creemos procedente sostener en los casos de autos un sistema más agudo que el que proponemos, bajo la justificación de que podría limitar más aún la incidencia criminal. Nos parece esto una presunción un tanto especulativa y, por lo tanto, injustificada. Más aún, podría sentar un mal precedente para nuestro sistema democrático de gobierno. Entendemos que éste es el efecto que razonablemente podría tener el esquema que hoy avala la mayoría, respecto al ámbito de actuación permisible a las asociaciones de residentes al implantar la Ley sobre Control de Acceso. El esquema de la mayoría tiene el efecto de prohibir la entrada a áreas públicas a un gran número de personas, ya que la condiciona a que la persona revele necesariamente, aunque de forma limitada, asuntos de su vida privada personal como, por ejemplo, cuál es su nombre, a quién visita y cuándo, cosa que no toda persona está dispuesta a hacer. Ello, como hemos visto, sin adelantar necesariamente los propósitos de la ley. Otro efecto del esquema es que sienta un precedente para justificar la implantación de mecanismos que inciden excesivamente sobre los derechos ciudadanos, sin que exista una expectativa razonable de que la medida adelantará algún propósito legítimo. Creemos que debemos sostener con más vigor y ahínco nuestras libertades ciudadanas. No podemos permitir que nuestro sereno y objetivo juicio se vea quebrantado por la alta incidencia criminal. Como dijéramos hace

más de diez (10) años, no podemos sucumbir a esta tentación, debemos resistirla. *Arroyo v. Rattan Specialties, Inc.*, supra.

Por las razones expuestas, disentimos de la opinión mayoritaria, en lo que respecta al esquema autorizado en relación con el ámbito de acción que le es permisible a las comunidades involucradas en los casos de autos en la implantación de la Ley sobre Control de Acceso.[11] En su lugar sostendríamos el esquema que hemos desarrollado en la presente opinión. Además, concurrimos con la determinación que hace la mayoría respecto a la constitucionalidad de la ley y estamos conformes con la interpretación que se hace respecto al concepto de continuidad contenido en ella.

---

(11) Las medidas de control de acceso permitidas por la mayoría van a tener el nocivo e impermisible efecto de impedirle el acceso a una gran parte de las zonas urbanas, a extensos sectores de la población, especialmente a las clases socioeconómicas más desventajadas. Después de todo, estas personas, con raras excepciones, no conocerán a los residentes y con toda probabilidad no podrán justificar su deseo de entrar a una comunidad de acceso controlado. Aunque la mayoría no lo dice expresamente, sí parece dejar entrever que el simplemente querer disfrutar de un paseo por estas comunidades podría prohibirse. El esquema sancionado por la mayoría, con muy raras excepciones también, va dirigido a permitir la entrada sólo a aquellas personas que tienen algo que ver con algún residente. Se está propiciando la segregación y el distanciamiento entre las clases sociales. Esto es dañino, corroe las fibras de nuestro sistema democrático de gobierno.